*This opinion is subject to revision before final
publication in the Pacific Reporter.*

**2014 UT 52**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

ELLIS-HALL CONSULTANTS, LLC,
*Petitioner,*

*v.*

PUBLIC SERVICE COMMISSION OF UTAH; PACIFICORP;
BLUE MOUNTAIN POWER PARTNERS, LLC; LATIGO WIND PARK, LLC;
and UTAH CLEAN ENERGY,
*Respondents.*

No. 20131146
Filed November 21, 2014

Original Proceeding in this Court

Attorneys:

Mary Anne Q. Wood, Stephen Q. Wood, Salt Lake City,
for petitioner

Jordan White, R. Jeff Richards, Daniel E. Solander, Gary A. Dodge,
Phillip J. Russell, Gary G. Sackett, Jessica W. Wilde,
Stephen K. Christiansen, Salt Lake City, for respondents

JUSTICE LEE authored the opinion of the court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE PARRISH joined.

JUSTICE LEE, opinion of the court:

¶1   In 2013, the Utah Public Service Commission approved power purchase agreements between PacifiCorp and two small power producers, Latigo Wind Park and Blue Mountain Power Partners. Under these agreements, PacifiCorp's Rocky Mountain Power division would become obligated to purchase all power produced by the producers' clean energy wind projects in Southeastern Utah. This is an appeal by Ellis-Hall Consultants, a competitor of Latigo and Blue Mountain. Ellis-Hall intervened in the PSC proceedings below and sought to challenge the Latigo and

Blue Mountain agreements. In so doing, Ellis-Hall asserted that the PSC had unlawfully excused Latigo and Blue Mountain from compliance with the terms of an applicable regulatory tariff, referred to as Schedule 38. It also claimed discrimination by PacifiCorp—in requiring Ellis-Hall to comply with the regulatory requirements from which Latigo and Blue Mountain had been excused. And it asserted that the power purchase agreements were too vague to be enforceable, and should be disapproved on that basis.

¶2　In light of the time-sensitive nature of this matter, we expedited this case for briefing and oral argument. And after oral argument we issued an order affirming the PSC's decision, with an opinion explaining our analysis to follow. The opinion below describes the bases for our decision. We hold that the cited terms of Schedule 38 were not contravened by the Latigo and Blue Mountain power purchase agreements, and that the "public interest" inquiry the PSC is charged with does not implicate the discrimination or vagueness concerns Ellis-Hall identifies.

I

¶3　Ellis-Hall, Blue Mountain, and Latigo are involved in the development of wind power generation projects in San Juan County. The end goal for each is to sell the power generated by those projects (known as qualifying facilities or "QFs") to PacifiCorp through its Rocky Mountain Power division—with that power then being transmitted along PacifiCorp's interstate transmission system via a local interconnection point.

¶4　A QF seeking to sell its generated power must enter into two distinct contractual arrangements, each subject to PSC approval. One is called a large generation interconnection agreement. This contract governs the QFs' use of PacifiCorp's transmission system. The other required contract is a power purchase agreement with Rocky Mountain Power. This latter agreement, governed by Utah Code section 54-12-2 and Rocky Mountain Power Electric Service Schedule No. 38,[1] controls Rocky Mountain

---

[1] Schedule 38 is an element of Tariff No. 49, a regulatory provision approved by the Utah Public Service Commission in October of 2012 and amended from time to time thereafter.

Power's obligation to purchase power from the QF, prescribing price, quantity, and duration.

¶5    In 2012 Latigo and Blue Mountain began negotiating the terms of a power purchase agreement with Rocky Mountain Power. They also began to pursue interconnection agreements with PacifiCorp for use of its local transmission point. Before finalizing their interconnection agreements, both Latigo and Blue Mountain executed power purchase agreements with Rocky Mountain Power and then submitted their agreements to the PSC for approval.

¶6    During this same time period, Ellis-Hall was also pursuing its own interconnection and power purchase agreements. When the Latigo and Blue Mountain power purchase agreements went before the PSC, Ellis-Hall had not yet secured a power purchase agreement. It was instead involved in negotiations over the terms of an interconnection agreement.

¶7    Ellis-Hall moved to intervene in the Latigo and Blue Mountain PSC proceedings. The PSC granted Ellis-Hall's motions. Ellis-Hall then filed formal objections to the approval of the Latigo and Blue Mountain power purchase agreements. First, Ellis-Hall claimed that PacifiCorp/Rocky Mountain Power had discriminated against Ellis-Hall in its pursuit of a power purchase agreement in violation of both state and federal law—subjecting Ellis-Hall to mandatory compliance with the terms of Schedule 38 but taking a more permissive, liberal approach with Latigo and Blue Mountain. Second, Ellis-Hall asserted that Latigo, Blue Mountain, and PacifiCorp had colluded in the negotiation of the power purchase agreements in a manner contravening the terms of Schedule 38 and the public interest element of federal and state law. Third, Ellis-Hall challenged the enforceability of the Latigo and Blue Mountain power purchase agreements, asserting that they were too vague to be enforceable. And finally, Ellis-Hall requested discovery of material related to its various claims.

¶8    During a hearing on these matters, the PSC determined that the public interest analysis was limited to whether the rates in the power purchase agreements were "just and reasonable." Accordingly, the PSC denied Ellis-Hall's discovery requests and motions to compel, concluding that the discovery went to matters not relevant to the public interest inquiry.

¶9   After holding the hearing and reviewing the evidence, the PSC issued an order approving the Blue Mountain and Latigo power purchase agreements. The PSC first rejected Ellis-Hall's argument that the "public interest" standard for approval of power purchase agreements goes beyond an inquiry into "just and reasonable" rates. Thus, because the power purchase agreements were consistent with the approved method for calculating the rates to be paid to QFs and because they contained terms and conditions that adequately protected ratepayers (consumers) from risk, the PSC determined that they were in the public interest.

¶10 The PSC then rejected both of Ellis-Hall's contentions regarding Schedule 38—that it mandated the procedures PacifiCorp had to follow and that PacifiCorp had discriminated against Ellis-Hall by permitting Latigo and Blue Mountain to secure power purchase agreements without having first secured interconnection agreements. As to the former argument, the PSC held that "Schedule 38 does not prescribe the due diligence that PacifiCorp *must* perform but rather acts as a check on the due diligence PacifiCorp *may* perform." And as to the latter, the PSC held that discrimination claims are "outside the scope of our consideration," and accordingly rejected that argument. Ellis-Hall now seeks review of the PSC's order.

¶11 We have jurisdiction under Utah Code section 78A-3-102(3)(e)(i), and review the PSC's decision under the terms of the Utah Administrative Procedures Act, UTAH CODE sections 63G-4-101 to -601. Our review of the PSC's factual determinations is deferential; we may reverse the agency's findings only if they are arbitrary, capricious, or "beyond the tolerable limits of reason." *Utah Chapter of the Sierra Club v. Utah Air Quality Bd.*, 2006 UT 74, ¶ 9, 148 P.3d 960 (internal quotation marks omitted). As to threshold legal questions, however, our review is nondeferential—de novo. *See Manzanares v. Byington (In re Baby B)*, 2012 UT 35, ¶ 41, 308 P.3d 382.

II

¶12 Ellis-Hall challenges the PSC's approval of the Latigo and Blue Mountain power purchase agreements on three grounds: (a) the PSC failed to require strict compliance with the terms of Schedule 38, which Ellis-Hall views as nondiscretionary; (b) PacifiCorp engaged in discrimination in its application of the terms of

Schedule 38—applying them leniently to Latigo and Blue Mountain but strictly to Ellis-Hall—in a manner inconsistent with the "public interest"; and (c) the terms of the Latigo and Blue Mountain power purchase agreements were too vague to be enforceable. We reject all three arguments and accordingly affirm.

## A. Schedule 38

¶13  Ellis-Hall first claims error in the PSC's failure to insist on strict compliance with the terms of Schedule 38. This claim rests specifically on the Schedule 38 provision regarding interconnection agreements. Ellis-Hall reads this provision to require an interconnection agreement as a prerequisite to the approval of a power purchase agreement, and charges the PSC with reversible error for not holding Latigo and Blue Mountain to strict compliance with this provision.

¶14 We view Schedule 38's terms differently. Granted, this document contemplates that owners of QFs above a certain capacity "will be required to enter into written power purchase and interconnection agreements" with PacifiCorp/Rocky Mountain Power, under the terms and conditions of the Schedule. Rocky Mountain Power Elec. Serv. Schedule No. 38, at 38.1 (Sept. 1, 2014), *available at* https://www.rockymountainpower.net/about/rar/uri.html. And, as Ellis-Hall indicates, the PSC has sometimes referred to the terms of Schedule 38 as "the steps required to obtain" a viable power purchase agreement. But that does not transform every term and condition of Schedule 38 into a hard-and-fast prerequisite. Instead, the nature and extent of the requirements of Schedule 38 are dictated by its terms. And the document speaks directly and unambiguously to Ellis-Hall's argument: It "reserves the right to condition execution of the power purchase agreement upon simultaneous execution of an interconnection agreement between the owner and the Company's power delivery function." *Id.* at 38.5.

¶15  That proviso is incompatible with Ellis-Hall's position. Far from *requiring* an interconnection agreement as a prerequisite to a purchase agreement, Schedule 38 deems this a discretionary matter. This is confirmed by the surrounding terms of the document, which simply state that "in addition to negotiating a power purchase agreement," QFs "are also required to enter into an interconnection agreement," and that "[i]t is *recommended* that [the QF]

initiate its request for interconnection as early in the planning process as possible" to ensure that the interconnection agreement and purchase agreement negotiations proceed "in a timely manner on a parallel track." *Id.* (emphasis added). Under the section prescribing the procedures for finalizing a power purchase agreement, moreover, Schedule 38 merely requires a QF to provide a written statement of the "*status* of interconnection arrangements." *Id.* at 38.2 (emphasis added); *see also id.* at 38.3–38.4 (noting that if a QF wishes for Rocky Mountain Power to draft a proposed power purchase agreement, the QF "may" be required to provide "evidence that any necessary interconnection studies have been completed and assurance that the necessary interconnection arrangements *are being made* in accordance with Part II" (emphasis added)).

¶16 Nowhere does Schedule 38 make an interconnection agreement a prerequisite to a power purchase agreement. It instead treats this as a matter of discretion. And in any event the document nowhere prescribes any timing requirement. Again it treats this as discretionary—*recommending* interconnection requests "as early in the planning process as possible," but nowhere dictating that the matter be finalized before the purchase agreement is entered into.

¶17 We affirm the Public Service Commission on this basis. We agree with the PSC that as to interconnection agreements, "Schedule 38 does not prescribe the due diligence that PacifiCorp *must* perform but rather acts as a check on the due diligence PacifiCorp *may* perform."

### B. The "Public Interest" and Alleged Discrimination

¶18 Ellis-Hall's next claim of error implicates its allegation of discrimination in the application of the terms of Schedule 38. Here the argument is one of differential treatment—that Latigo and Blue Mountain were given wide latitude as to the timing of an interconnection agreement, but Ellis-Hall has not been afforded such leniency. And Ellis-Hall asserts that this alleged discrimination calls into question the key determination for the PSC—whether the Latigo and Blue Mountain power purchase agreements were in the "public interest."

¶19 This argument implicates a threshold legal question—of the meaning of "public interest" in the terms of the governing

federal and state laws to be applied by the PSC. To sustain its challenge to the PSC's approval of the Latigo and Blue Mountain power purchase agreements, Ellis-Hall would first have to establish that its concerns regarding discrimination are implicated by the "public interest" standard that the PSC is charged with applying. We affirm on the ground that Ellis-Hall has failed to carry that burden.

¶20 Ellis-Hall cites generally to provisions of state and federal law that protect power producers from discriminatory business practices.[2] But none of these provisions are properly implicated in this proceeding. In considering the parties' power purchase agreements for approval, the PSC is tasked with a narrow, specific inquiry—to approve the agreed-upon power purchase *rates* as consistent with the "public interest." That inquiry does not implicate the broader discrimination concerns identified by Ellis-Hall, and we affirm on that basis, as explained below.

¶21 The PSC administers state and federal laws requiring PacifiCorp to purchase wholesale power from QFs. Its jurisdiction over QF rates and the public interest originate in federal law. Under the Public Utility Regulatory Policies Act of 1978 (PURPA), Pub. L. No. 95-617, 92 Stat. 3117, the Federal Energy Regulatory Commission (FERC) is required to set rates for purchases from QFs that are "just and reasonable to the electric consumers of the electric utility and [are] in the public interest." 16 U.S.C. § 824a-3(b)(1). And PURPA also "requires each state regulatory authori-

_____

[2] *See* 18 C.F.R. § 292.304(a)(1)(ii) (2014) (prohibiting discrimination "against qualifying cogeneration and small power production facilities"); *id.* § 358.4(a)–(c) (requiring "strict" enforcement of "all tariff provisions relating to the sale or purchase of open access transmission service, if the tariff provisions do not permit the use of discretion"); UTAH CODE § 54-3-7 (prohibiting public utilities from "extend[ing] to any person any form of contract or agreement, or any rule or regulation, or any facility or privilege except such as are regularly and uniformly extended to all corporations and persons"); *id.* § 54-3-8(1)(a) (prohibiting public utilities from "mak[ing] or grant[ing] any preference or advantage to any person" with regard to any "rates, charges, service, facilities or in any other respect").

ty . . . to implement FERC's rules." *FERC v. Mississippi*, 456 U.S. 742, 751 (1982) (citing 16 U.S.C. § 824a-3(f)). Thus, PURPA gives FERC, and by extension the PSC, "a statutory mandate to set a rate that is in the public interest." *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 417 (1983) (internal quotation marks omitted).

¶22 The "public interest," in this legal context, does not encompass any and all considerations of interest to the public—such as the nondiscrimination principles cited by Ellis-Hall. Instead "the words 'public interest' in a regulatory statute . . . take meaning from the purposes of the regulatory legislation" in question. *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976). And here those purposes are limited—focusing on the setting of "reasonable prices," *id.* at 670, and on establishing incentives for the increased production of QF facilities "to reduce reliance on fossil fuels." *Am. Paper Inst.*, 461 U.S. at 417; *see also* UTAH CODE § 54-12-1(2) ("[T]he policy of this state [is] to . . . promote a diverse array of economical and permanently sustainable energy resources in an environmentally acceptable manner"); *id.* § 54-12-2(2) ("The commission shall establish reasonable rates, terms, and conditions for the purchase or sale of electricity. . . .").

¶23 Both federal and state law balance these objectives by requiring public utilities to purchase power from QFs at, or in some cases below, a utility's "full avoided cost." 18 C.F.R. § 292.304(a)(2), (b)(2)–(3) (2014); UTAH CODE § 54-12-2(2).[3] *Avoided cost* is "the incremental cost[] to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." 18 C.F.R. § 292.101(b)(6). In plain English, this means that public utilities purchase QF

---

[3] *See also* Steven R. Miles, Note, *Full-Avoided Cost Pricing Under the Public Utility Regulatory Policies Act: "Just and Reasonable" to Electric Consumers?*, 69 CORNELL L. REV. 1267, 1277 n.66 (1984) (discussing the public interest requirement and the purposes of PURPA and explaining that "[b]y establishing the price for purchases from qualifying facilities at the statutory ceiling, the full-avoided cost rule fulfills [the] purpose [of PURPA] to the maximum extent permissible").

power at the same rate the utility would have paid in acquiring or producing the same power through other means.

¶24 This concept of avoided cost is incorporated in the Latigo and Blue Mountain power purchase agreements. These contracts prescribe PacifiCorp's avoided cost as the rate to be paid for QF power produced by Latigo and Blue Mountain. And the decision before us in this case is the PSC's approval of that rate as consistent with the public interest.

¶25 We affirm that decision. Ellis-Hall has nowhere contested the PSC's conclusion that an avoided cost rate is in the public interest. Nor could it. As the above-cited standards indicate, avoided cost rates are a safe-harbor of reasonableness in advancing the public's interest in protecting ratepayers.

¶26 We likewise reject Ellis-Hall's attempt to inject broader nondiscrimination principles into the PSC's approval of the QF rates agreed to in the Latigo and Blue Mountain power purchase agreements.[4] Those principles were not the domain of the PSC in this proceeding. Its role was simply to approve the agreed-upon rates as consistent with the statutory and regulatory concept of the public interest. And because that concept is limited to the rea-

---

[4] It is worth mentioning that some of the federal anti-discrimination provisions Ellis-Hall cites cut decidedly against the substance of its discrimination argument. For instance, the Code of Federal Regulations requires "strict[]" enforcement of "all tariff provisions relating to the sale or purchase of open access transmission service, *if the tariff provisions do not permit the use of discretion*." 18 C.F.R. § 358.4(a) (emphasis added). In other words, the federal anti-discrimination regulations clearly contemplate some discretion and leniency in the process. *See also id.* § 358.4(b)–(c) (prohibiting the application of tariff provisions in any "*unduly* discriminatory manner, *if the tariff provisions permit the use of discretion*" and prohibiting the giving of any "*undue* preference . . . relating to the sale or purchase of transmission service" (emphasis added)).

sonableness of the rates in question, Ellis-Hall's argument fails as a matter of law.[5]

¶27 Ellis-Hall's challenge to the denial of its discovery requests fails on the same ground. Ellis-Hall sought discovery on the nature and extent of any differential treatment by PacifiCorp/Rocky Mountain Power. Because those issues were irrelevant to the PSC's assessment of the power rates set forth in the Latigo and Blue Mountain agreements, the PSC was right to deny Ellis-Hall's requests for discovery. We therefore also affirm the PSC's denial of Ellis-Hall's requests for discovery.

### C. Enforceability of Power Purchase Agreements

¶28 Ellis-Hall's final claim touches on the enforceability of the Latigo and Blue Mountain power purchase agreements. The argument here is that certain terms of these agreements—such as the type of turbine to be utilized by these QFs—are too vague to be enforceable.

¶29 This claim falters on grounds set forth above. Again, the PSC's role in approving a QF power purchase agreement is to confirm that the *rates* agreed to are in the "public interest." *See supra* ¶¶ 20–26. And that question is resolved conclusively—and in favor of affirmance—by the avoided-cost terms of the Latigo and Blue Mountain power purchase agreements.

---

[5] Ultimately, Ellis-Hall's assertion of discrimination turns on the concern that the terms of Schedule 38 have been applied leniently to Latigo and Blue Mountain. Even if that concern were properly presented, it would not sustain a finding of discrimination "against qualifying cogeneration and small power production facilities," 18 C.F.R. § 292.304(a)(1)(ii)—much less a remedy of more restrictive treatment of Latigo and Blue Mountain. An alternative remedy would be to confer similar leniency on Ellis-Hall. And unless and until such treatment is withheld (in Ellis-Hall's pursuit of its own power purchase agreement), any claim of discrimination is unripe.

¶30 Once that determination was (properly) made, there was no work left for the PSC to do. Thus, the PSC was not thereafter tasked to assess the vagueness or enforceability of the Latigo or Blue Mountain agreements. This final claim of error accordingly fails regardless of whether the terms of the contract are too vague to be enforceable.

———————