*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2016 UT 34**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

ELLIS-HALL CONSULTANTS,
*Petitioner,*

*v.*

PUBLIC SERVICE COMMISSION OF UTAH,
*Respondent.*

No. 20140616
Filed July 28, 2016

On Petition for Review of an Administrative Order
Docket No. 14-035-24

Attorneys:

Mary Anne Q. Wood, Stephen Q. Wood, Salt Lake City,
for petitioner

Sean D. Reyes, Att'y Gen., Nancy L. Kemp, Justin C. Jetter,
Asst. Att'ys Gen., Salt Lake City, for respondent

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in
which CHIEF JUSTICE DURRANT, JUSTICE DURHAM, JUSTICE HIMONAS,
and JUSTICE PEARCE joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1    Ellis-Hall Consultants is involved in the development of
wind power projects in Southeastern Utah. The aim of these projects
is to sell power to PacifiCorp through its Rocky Mountain Power
division. To qualify to do so, Ellis-Hall is required to enter into and
secure agency approval of a power purchase agreement. But first
Rocky Mountain Power is required by governing regulations to
provide "indicative pricing" to a producer seeking to pursue a
power purchase agreement. Indicative pricing is to be "tailored to
the individual characteristics of the proposed project." *Rocky
Mountain Power, Electric Service Schedule No. 38* I.B(4) (2014). And it is
aimed at allowing the producer to "make determinations regarding
project planning, financing, and feasibility." *Id.*

¶2    Ellis-Hall received an indicative pricing proposal in 2012. Yet Rocky Mountain Power later rescinded that proposal and refused to proceed with negotiations on a power purchase agreement under its earlier indicative pricing. It did so on the ground that the Utah Public Service Commission had since issued an order adopting a new pricing methodology. Ellis-Hall challenged that decision in a proceeding before the Commission. Ellis-Hall asserted a right to rely on the old indicative pricing proposal in negotiating a power purchase agreement. The Commission disagreed. We reverse.

I

¶3    To encourage the development of alternative energy resources, federal law requires a utility to purchase wind energy and other forms of alternative power from qualifying facilities[1] at its avoided cost—what it would have cost the utility to generate the power itself or purchase it from another source. 16 U.S.C. § 824a-3; 18 C.F.R. § 292.101. The Commission establishes the methodology for determining avoided cost. It also promulgates regulatory tariffs establishing the rules for the negotiation and approval of power purchase agreements.

¶4    The tariff in question here is called Electric Service Schedule 38. Schedule 38 was adopted by the Commission in 2003. It governs negotiations between a qualifying facility and Rocky Mountain Power.

¶5    Under Schedule 38, Rocky Mountain Power is required to provide a qualifying facility with an indicative pricing proposal once the facility submits certain information regarding a proposed project. The pricing proposal must be "tailored to the individual characteristics of the proposed project." *Schedule 38* I.B(3). And it is aimed at allowing the owner of the qualifying facility to "make determinations regarding project planning, financing, and feasibility." *Id.*

¶6    Schedule 38 also notes that indicative "prices are merely indicative and not final and binding" until the parties negotiate and execute a power purchase agreement that is approved by the Commission. *Id.* And it identifies specific subsequent steps that a

---

[1] The federal standards for qualifying facility status are set forth in 18 C.F.R. § 292.203. We are not asked here to decide whether Ellis-Hall's project is a qualifying facility.

qualifying facility should take to be entitled to receive a draft power purchase agreement and to proceed toward final negotiation.

¶7 Rocky Mountain Power may "update its pricing proposals" in response to "changes to the Company's avoided-cost calculations." *Id.* at I.B(6)(c). But it may "not unreasonably delay negotiations" and must "respond in good faith." *Id.* at I.B(6)(2). Beyond that Schedule 38 says little about the relationship between avoided cost methodologies and indicative pricing. It does not speak specifically to the effect of a change in avoided cost methodology on existing indicative pricing proposals.

¶8 The Commission adopted a "market proxy" methodology for determining the avoided cost for wind power projects in 2005. Under that method, avoided cost was determined by reference to Rocky Mountain Power's most recent request for a proposal to supply wind energy. So this method pegged avoided cost at the level of the most recent market-based wind contract—executed in 2009—rather than looking at the current cost to generate energy. At the time this methodology was adopted, it was considered fair because Rocky Mountain Power anticipated sending out a request for a proposal and negotiating a new price each year.

¶9 Ellis-Hall requested indicative pricing for its wind power project in 2012. At that time the "market proxy" methodology was still in place. Soon thereafter, however, Rocky Mountain Power sought the Commission's approval for a change in methodology. Because Rocky Mountain Power had not issued a proposal in several years and the cost of producing wind energy had decreased, it argued that it was overpaying under the market proxy methodology. It also sought a stay—an order allowing it to refuse to issue new indicative pricing proposals until the Commission could decide whether to adopt a new methodology.

¶10 Ellis-Hall moved to intervene. It sought to challenge the requested change in methodology and to block the issuance of a stay. The Commission granted Ellis-Hall's motion to intervene. It also bifurcated the proceedings into two phases.

¶11 In the first phase the Commission considered—and denied—Rocky Mountain Power's request for a stay. In so doing, the Commission explained that the request "ignore[d] the practical realities of bringing a large wind [qualifying facility] project from inception to conclusion, in assuming all five projects in the queue [including Ellis-Hall] would be able to negotiate power purchase agreements before our order in Phase Two." *Id.* at 17. Yet the Commission also noted the possibility that "the outcome of the

Phase Two hearings and the interests of ratepayers may require the application of new avoided cost calculations for . . . projects not in possession of executed power purchase agreements when the Phase Two order is issued." *Id.*

¶12 After the Commission's "Phase One" order was issued, Rocky Mountain Power provided Ellis-Hall with an indicative pricing proposal based on the market proxy methodology. Before Ellis-Hall was able to negotiate a power purchase agreement with Rocky Mountain Power, however, the Commission issued its "Phase Two" order. This order "discontinue[d]" use of the market proxy methodology "for determining indicative prices for Schedule 38 wind [facilities] going forward." *Order on Phase Two Issues* at 18. It also adopted a new avoided cost methodology—the Proxy/PDDRR (partial displacement differential revenue requirement) method, which allowed Rocky Mountain Power to determine its avoided cost based on current energy production cost rather than the cost of the most recently executed proposal. This new methodology was expected to lower Rocky Mountain Power's avoided costs.[2] *Id.* Finally, the Phase Two order provided that the market proxy method was discontinued "going forward." *Id.* It accordingly concluded that "future requests for indicative pricing" would be governed by the new methodology, thus "ensur[ing]" that "future indicative prices . . . will reflect" market costs "appropriately." *Id.*

¶13 In reliance on the Phase Two order, Rocky Mountain Power sent Ellis-Hall a letter stating that "the previously provided indicative pricing [was] no longer valid." *Order Dismissing Ellis-Hall Complaint* at 5. It also asked Ellis-Hall to submit a request for "updated indicative pricing" under Schedule 38 if it wished to proceed toward a power purchase agreement. *Id.* Ellis-Hall refused to submit such a new request. Instead it filed a complaint with the Commission, asserting that Rocky Mountain Power was required to honor its prior indicative pricing proposal and to negotiate a power purchase agreement using the market proxy methodology. In Ellis-Hall's view there was no need for a request for new indicative pricing, as it already had an indicative pricing proposal and was entitled to rely on it in negotiating a power purchase agreement.

---

[2] This seems to be undisputed. None of the parties suggest that an avoided cost determined under the new methodology would result in Ellis-Hall being paid more for its energy production. And Ellis-Hall asserts that it is no longer economically feasible for it to proceed under the new methodology.

And Ellis-Hall claimed that the Phase Two order had no application to existing indicative pricing proposals, but only to future requests for such proposals.

¶14 The Commission rejected Ellis-Hall's position. It concluded that the "plain language of Schedule 38, the Phase [One] Order and the Phase [Two] Order" require Rocky Mountain Power to utilize the new methodology. *Order Dismissing Ellis-Hall Complaint* at 21. First, the Commission noted that the market proxy method was "discontinued pursuant to the [Phase Two order]." Second, the Commission stated that the Phase One order "fully anticipated the possibility that a change in its avoided cost method would result in the application of new avoided cost calculations for all large wind . . . projects not in possession of executed power purchase agreements when the Phase [Two] order was issued." *Id.* at 21.

¶15 For these reasons, the Commission concluded that its orders did not "vest [Ellis-Hall] with indicative pricing" calculated using an outdated method. *Id.* at 22. It also held that Rocky Mountain Power was required "to update pricing to reflect changes to avoided cost calculations" under Schedule 38 and the "underlying mandates of federal and Utah state law." *Id.* at 20–21. And because prices are not "final and binding" until a power purchase agreement is negotiated, the Commission held that Ellis-Hall was not entitled to continue to rely on the methodology used in Rocky Mountain Power's indicative pricing proposal. *Id.* at 23.

¶16 Ellis-Hall filed a petition for review or rehearing with the Commission, which was denied. It subsequently filed a timely petition for review with this court.

II

¶17 Ellis-Hall raises pure questions of law in its petition challenging the Commission's decision. It claims error in the Commission's interpretation of both Schedule 38 and the Phase One and Phase Two orders.

¶18 A threshold question presented concerns the governing standard of review. We first conclude that we owe no deference to the Commission's legal conclusions. We then proceed to consider the Commission's interpretation of Schedule 38 and of the two orders in question. And we conclude that the Commission erred determining Ellis-Hall did not have a right to rely on the indicative pricing provided by Rocky Mountain Power under the market proxy method and was required to submit a request for new indicative pricing.

A

¶19 We have sometimes said that "we give considerable weight" to the [Public Service Commission's] interpretations of technical provisions such as tariffs." *McCune & McCune v. Mountain Bell Tel.*, 758 P.2d 914, 917 (Utah 1988). And we have justified such deference on the basis of an inference of "legislative intent to delegate" to the "responsible agency" the discretionary power to interpret its regulations. *Utah Dep't of Admin. Servs. v. Pub. Serv. Comm'n*, 658 P.2d 601, 610 (Utah 1983).

¶20 The Commission asks us to apply that standard here. It seeks affirmance on the ground that its interpretation of Schedule 38 and the Phase One and Phase Two orders falls "within the limits of reasonableness or rationality." *McCune & McCune*, 758 P.2d at 917; *see also Bradshaw v. Wilkinson Water Co.*, 2004 UT 38, ¶ 11, 94 P.3d 242.

¶21 We acknowledge the apparent basis for the Commission's position under the cited cases. But we conclude that the deferential standard of review set forth above has been overtaken by more recent authority. And we conclude that the appropriate standard is a non-deferential one that reviews the Commission's conclusions of law—its interpretations of its prior orders and regulatory provisions like Schedule 38—for correctness.

¶22 For years our caselaw was riddled with tension on the question of the standard of review that applies to judicial review of agency action. *See Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 11, 308 P.2d 461 (noting "our inconsistent precedent on . . . standards of review" under the Utah Administrative Procedures Act). On one hand, we had held that an agency's legal conclusions could be subject to a deferential standard of review where the legislature "has either explicitly or implicitly delegated discretion to an agency to interpret or apply the law." *Id.* ¶ 12 (citing *Morton Int'l, Inc. v. Tax Comm'n*, 814 P.2d 581, 588 (Utah 1991)). On the other hand, in some cases we had applied traditional standards of review to agency decisions—standards that turned on whether an agency's decision turned on a question of law, a question of fact, or a mixed question. *Id.* ¶ 13 (citing *Drake v. Indus. Comm'n*, 939 P.2d 177, 179–81 (Utah 1997)).

¶23 *Murray* overruled the first line of cases in favor of the latter. It held that "the appropriate standard of review of final agency actions will depend on the type of action in question"—on "whether it can be characterized as" turning on "a question of law, a question of fact, or a mixed question of law and fact." *Id.* ¶ 22. And it repudiated the notion that an agency's "authority" to apply a

statutory framework sustained an inference of "discretion" leading to deference to its decisions. *See id.* ¶ 28 (noting that the inquiry into whether the legislature had made a "delegation[] of discretion" to an agency had "proved difficult to apply" and holding that a "grant of authority" to an agency "does not turn an agency's application or interpretation of the law" into a discretionary decision warranting deference).

¶24 *Murray* thus calls for non-deferential "correctness" review of agency conclusions of law. *See id.* ¶¶ 9, 12. That is the traditional standard that applies on review of pure legal questions. *See Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, ¶ 41, 308 P.3d 382. And it is thus the standard that applies under *Murray*.

¶25 We reinforced that conclusion in *Hughes General Contractors v. Utah Labor Commission*, 2014 UT 3, 322 P.3d 712. There we indicated that we have "openly repudiated" a standard of deference to administrative agencies like that which applies in federal court under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Id.* ¶ 25. And we clarified that "we have retained for the courts the de novo prerogative of interpreting the law, unencumbered by any standard of agency deference." *Id.*

¶26 *Hughes* also clarifies a point made in *Murray*. It notes that deference to agencies is limited to circumstances prescribed by statute or required by our caselaw—"as when an agency makes a factual determination, or 'whenever the Legislature directs an agency to engage in [discretionary] decisionmaking.'" *Id.* ¶ 25 n.4 (alteration in original). But *Hughes* also highlights the limited nature of the kind of discretionary judgments that qualify for deference: "A 'discretionary decision involves a question with a range of 'acceptable' answers, some better than others, and the agency . . . is free to choose from among this range without regard to what an appellate court thinks is the 'best' answer.'" *Id.* (alteration in original) (quoting *Murray*, 2013 UT 38, ¶ 30). And *Hughes* emphasizes that "[s]tatutory interpretation does not present such a discretionary decision," and thus is not subject to deferential review. *Id.*

¶27 We now reinforce our holdings in *Murray* and *Hughes*. We reiterate that agency decisions premised on pure questions of law are subject to non-deferential review for correctness.

¶28 In so holding, we repudiate our prior decisions calling for deference to an agency's interpretation of its own orders or regulatory enactments. And we hold that the Commission is not

entitled to deference as to its interpretation of Schedule 38 or its Phase One and Phase Two orders.

¶29 As the Commission notes, we have sometimes called for deference to an agency's interpretation of its own regulations on the ground that the agency "is best suited to say what its orders mean." *Reaveley v. Pub. Serv. Comm'n*, 436 P.2d 797, 799 (Utah 1968). And there is a parallel principle of deference in federal law. *See Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945) (providing for deference to agency interpretation of its own regulations unless it is "plainly erroneous or inconsistent with the regulation"); *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (same).

¶30 We are in no way bound by the federal standard, however. And the underlying premises of this principle of deference are irreconcilable with our decisions in *Murray* and *Hughes*.

¶31 Schedule 38 is law. So are the orders issued by the Commission. *See Salt Lake Citizens Cong. v. Mountain States Tel. & Tel. Co.*, 846 P.2d 1245, 1253 (Utah 1992) (holding that "[r]ules of law developed in the context of agency adjudication are as binding as those promulgated by agency rule making"). They are accordingly binding on interested parties like Ellis-Hall. And such parties have a right to read and rely on the terms of these regulations. Because the words in the Commission's orders have the force of law, the Commission has no right to *revise* them by a later "interpretation."[3] It is the Commission's orders and tariffs that have the force of law, not its privately held intentions. So an agency has no authority to override the terms of an issued order by vindicating the agency's "true" intent. Agencies make law by issuing orders or promulgating regulations. Privately held intentions that contradict such rules are not law.

¶32 We are in as good a position as the agency to interpret the text of a regulation that carries the force of law. In fact, we may be in a better position. The agency here is in the position of lawmaker; in adopting Schedule 38 and issuing the two orders in question, the Commission has exercised authority delegated to it by the legislature. With that in mind, it makes little sense for us to defer to

---

[3] An agency, of course, may have the authority in certain circumstances to repeal a prior order and issue a new one. But such power is distinct from the power to *interpret* an existing order. And the Commission has not repealed Schedule 38 or either of its operative orders.

the agency's interpretation of law of its own making. If we did so we would place the power to write the law and the power to authoritatively interpret it in the same hands. That would be troubling, if not unconstitutional.[4] *See* UTAH. CONST. art. V, § 1 (forbidding any one branch of government from "excercis[ing] any functions appertaining to either of the others").

¶33 "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). We accordingly review the Commission's interpretation of Schedule 38 and the Phase One and Phase Two orders without affording any deference to the Commission.

B

¶34 The Commission's Phase One order concludes that "the outcome of the Phase Two hearings and the interests of ratepayers *may* require the application of new avoided cost calculations" for those "not in possession of executed power purchase agreements when the Phase Two order is issued." *Order on Motion to Stay Agency Action* at 17–18 (emphasis added). And the Phase Two order in fact adopts a new avoided cost methodology. It repudiates the market proxy method "for determining indicative prices . . . going forward" and concludes that the Proxy/PDDRR method "is a reasonable method for determining wind resource indicative prices *going forward*." *Order on Phase Two Issues* at 18 (emphasis added).

¶35 The Commission interpreted these orders as repudiating the terms of any indicative pricing for entities (like Ellis-Hall) not yet "in possession of executed power purchase agreements when the Phase Two order issued." *Order Dismissing Ellis-Hall Complaint* at 21. It sought to buttress that conclusion, moreover, by reference to the terms of Schedule 38. Schedule 38 authorizes Rocky Mountain Power to "update its pricing proposals at appropriate intervals to accommodate any changes to the Company's avoided-cost

---

[4] The executive and legislative branches do interpret the law, of course. And agencies interpret laws of their own making with some regularity. But such interpretation—in the process of fulfilling constitutionally assigned powers—is different from exercising authoritative power to say what the law is. Only the judicial branch does that. And when another branch interprets law in the course of fulfilling its governmental functions, it is ultimately subject to judicial review without deference by the courts. Such review preserves the proper separation of powers.

calculation." *Schedule 38* I.B(6)(c). And it provides that "[p]rices and other terms and conditions in the power purchase agreement will not be final and binding until the power purchase agreement has been executed by both parties and approved by the Commission." *Id.* I.B(7).

¶36    In light of the above, the Commission concluded that the Phase Two order "does not vest" qualifying facilities with a right to rely on "indicative pricing calculated using an outdated method and received under Schedule 38" prior to issuance of that order. *Order Dismissing Ellis-Hall Complaint* at 22. "Rather," the Commission held, "indicative prices are required to be updated to reflect new avoided costs calculations until a power purchase agreement is executed by both parties." *Id.* And because the indicative pricing issued to Ellis-Hall had not been adopted in a power purchase agreement executed by both parties and approved by the Commission, the Commission held that Ellis-Hall was required to submit a request for new indicative pricing before it could proceed with a power purchase agreement.

¶37    We reverse. We construe the terms of the Phase Two order, when read in light of the Phase One order and Schedule 38, to yield a right to a wind power developer to rely on the methodology set forth in the "indicative pricing proposal" it receives from Rocky Mountain Power. The precise calculations in the indicative pricing proposal, of course, are not set in stone; Schedule 38 makes clear that Rocky Mountain Power may "update" its proposals to make changes to its calculations. But the operative terms of the Commission's orders and of Schedule 38 give entities like Ellis-Hall a right to rely on the methodology employed in an indicative pricing proposal once it is given.

¶38    We reach that conclusion for several reasons. First, the Phase One order nowhere mandates a new avoided cost methodology; it simply says that the Phase Two proceedings "and the interests of ratepayers *may* require" a new methodology. *Phase One Order* at 17 (emphasis added). Significantly, moreover, the Phase One order declines to stay the market proxy methodology. And in so doing it indicates that the request for a stay "ignores the practical realities of bringing a large wind [qualifying facility] project from inception to conclusion, in assuming all five projects in the queue [including Ellis-Hall's] would be able to negotiate power purchase agreements before" the Phase Two order was entered. *Id.*

¶39    Second, the Phase Two order does not mandate retroactive application of the new Proxy/PDDRR methodology; it deems that methodology a "reasonable" one "for determining wind resource

indicative prices *going forward.*" *Phase Two Order* at 18 (emphasis added). The same formulation is used as to discontinuation of the market proxy method—that method is discontinued "for determining indicative prices . . . *going forward.*" *Id.* (emphasis added). And, importantly, the new methodology is mandated only as to "*future requests* for indicative pricing." *Id.* (emphasis added). This formulation is significant given that Ellis-Hall has not made a new request for indicative pricing. It already has indicative pricing and claims a right to use it in negotiating a power purchase agreement.

¶40 Because Ellis-Hall already had an indicative pricing proposal, it had no obligation under the Phase Two order to submit a new request. Nothing in the Phase Two order requires or even permits Rocky Mountain Power to issue a new indicative pricing proposal. And that seems understandable in light of the "practical realities of bringing a large wind [qualifying facility] project from inception to conclusion" noted in the Phase One order.

¶41 Third, Schedule 38 gives a would-be qualifying facility a right to receive "indicative" pricing and does so for the purpose of allowing the wind power developer "to make determinations regarding project planning, financing, and feasibility." *Schedule 38* at I.B.3. An *indicative* pricing proposal is one that "show[s] the way to or the direction of" the pricing that Rocky Mountain Power ultimately has in mind for the power purchase agreement. AM. HERITAGE DICTIONARY 894 (5th ed. 2011) (defining *indicate* as "[t]o show the way to or the direction of").[5] Thus, the precise terms of Rocky Mountain Power's indicative pricing could change as a result of "updated information" or "changes to [Rocky Mountain Power's] avoided-cost calculations." *Schedule 38* at I.B(4), I.B(6)(c). But to be *indicative*, the pricing proposal would have to "point[] out more or less exactly" the methodology of Rocky Mountain Power's pricing proposal, or in other words would have to "reveal[]" it "fairly clearly." WEBSTER'S THIRD NEW INT'L DICTIONARY 1150 (2002).[6]

---

[5] The term "indicative pricing" is not defined in Schedule 38. Nor is there any indication that it has acquired an established meaning in the law or in the energy industry. So we construe the phrase as conveying its ordinary meaning. *See Barneck v. Utah Dep't of Transp.*, 2015 UT 50, ¶ 28, 353 P.3d 140.

[6] In light of the above we need not and do not reach the question whether Schedule 38 should be construed "strictly" against Rocky

(continued…)

¶42    A prior pricing proposal ceases to be *indicative* if it is subject not just to an "update[]" or to new "calculations" but to a fundamental change in methodology. And if Rocky Mountain Power retains the right to alter the methodology underlying a prior indicative pricing proposal, the would-be qualifying facility is hardly in a position to use it "to make determinations regarding project planning, financing and feasibility." *Schedule 38* at I.B.(3).

## III

¶43    For these reasons we conclude that Ellis-Hall is not required to submit a request for new indicating pricing from Rocky Mountain Power. It is entitled to proceed in reliance on the methodology set forth in the indicative pricing proposal it received from Rocky Mountain Power.

¶44    That does not mean that Ellis-Hall has a right to require Rocky Mountain Power to enter into a power purchase agreement, or to require the Commission to approve such an agreement. Those questions are not properly presented for our review. And we accordingly decline to reach them.

¶45    Rocky Mountain Power has urged us to affirm on the basis of its purported right not to enter into a power purchase agreement with Ellis-Hall. Because it claims the discretion not to enter into a power purchase agreement, Rocky Mountain Power says that it can require Ellis-Hall to start over by submitting a new request for indicative pricing. And once that request is submitted, Rocky Mountain Power claims an unquestioned right to rely on the new Proxy/PDDRR methodology. With that in mind, Rocky Mountain Power asserts that Ellis-Hall's position will fail in the long run even if it prevails on the issues presented for our review here.

¶46    These questions are not properly presented here, however. The question of Rocky Mountain Power's discretion not to enter into a power purchase agreement—and of the effect on any such discretion on Ellis-Hall's rights under the Commission's orders—is simply unripe at this juncture. Rocky Mountain Power has not yet

---

Mountain Power, as Ellis-Hall urges. *See Josephson v. Mountain Bell*, 576 P.2d 850, 852 (Utah 1978) (calling for strict construction of tariff issued by telephone utility); *but see Jex v. Utah Labor Comm'n*, 2013 UT 40, ¶ 56, 306 P.3d 799 (repudiating substantive canon of construction of Workers Compensation Act; clarifying that liberal canon of construction was at most a "tie-breaker" after the court first seeks to yield a reasonable construction of the statutory text).

sought to exercise such discretion and the Commission has yet to rule upon these issues. And for that reason our views on these issues would be premature and advisory.[7]

¶47    The same goes for an alternative ground for affirmance advanced by the Commission. The Commission says that a decision requiring Ellis-Hall and Rocky Mountain Power to proceed with negotiations on a now-outdated indicative pricing proposal will ultimately be thwarted by an inevitable decision by the Commission to decline to approve a power purchase agreement based on such methodology. To support that view, the Commission points to provisions of state and federal law that purportedly would foreclose the power purchase agreement that Ellis-Hall wishes to secure. *See* 16 U.S.C. § 824a-3 (mandating that rates charged for the purchase of energy not "exceed[] the incremental cost to the electric utility of alternative electric energy"). But again we view this issue as premature. The Commission has not as yet declined to approve a power purchase agreement sought by Ellis-Hall. And we accordingly are not in a position to offer an advisory opinion on a matter that is not yet ripe for our review.

¶48    For these reasons we are in no position to decide whether Ellis-Hall has an ultimate right to enter into a power purchase agreement with Rocky Mountain Power or to secure approval from the Commission. But we do conclude that it is entitled, for now, to rely on the indicative pricing proposal it was provided in the past, and it has no obligation to submit a request for new indicative pricing as it moves forward in negotiations over a power purchase agreement with Rocky Mountain Power.

———————

[7] The point is not that Ellis-Hall has no stake in the outcome of this case. Our holding implies a duty for Rocky Mountain Power to move forward with further negotiations in good faith. *See Schedule 38* I.B.(6)(a). But the outcome of those negotiations is by no means guaranteed. Thus, our holding is that Ellis-Hall has won a short-term battle. It remains to be seen whether it will prevail in the larger war.