**2017 UT App 143**

# THE UTAH COURT OF APPEALS

ANTIONETTE AIONO,
Petitioner,

*v.*

DEPARTMENT OF CORRECTIONS,
Respondent.

Opinion
No. 20160030-CA
Filed August 10, 2017

Original Proceeding in this Court

Bret W. Rawson, Nate N. Nelson, and Jeremy G.
Jones, Attorneys for Petitioner

Sean D. Reyes, J. Clifford Petersen, and Daniel R.
Widdison, Attorneys for Respondent

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
GREGORY K. ORME and J. FREDERIC VOROS JR. concurred.[1]

TOOMEY, Judge:

¶1    This case requires us to determine whether a Utah
Department of Corrections (UDC) employee, whose conduct
may well have violated best practices, can be fired for that
conduct if it is not explicitly prohibited by policy. The Career
Service Review Office (CSRO) upheld UDC's decision to fire
Antionette Aiono for violating a policy governing prohibited
associations. Because the policy does not prohibit what Aiono
did, we set aside the CSRO's decision.

---

1. Judge J. Frederic Voros Jr. participated in this case as a
member of the Utah Court of Appeals. He retired from the court
before this decision issued.

BACKGROUND

¶2     Aiono was a UDC correctional officer assigned to the Orange Street Community Correction Center. In May 2015 she worked an overtime shift at the prison in Draper in section 3/4 of the Oquirrh facility. The Oquirrh facility has two sections, designated as Oquirrh 1/2 and 3/4.

¶3     Three of Aiono's relatives were in prison at the time—her husband M.A. (Husband), her cousin P.W., and her cousin W.W. (Cousin). Husband and P.W. were incarcerated in Oquirrh 1/2, and Cousin was in 3/4. Aiono knew where Husband and P.W. were housed but did not know that Cousin was in the 3/4 section until the day she reported for her overtime shift.

¶4     When she arrived at Oquirrh 3/4, Aiono talked with the day shift sergeant (Sergeant), who recognized her last name and asked "if she was ok to work there." He asked whether Husband was in 1/2. Aiono acknowledged that he was and that she could not go there, but told him she could work in 3/4. Sergeant was aware of Aiono's relationship with Cousin and knew that Cousin was housed in Oquirrh 3/4. Sergeant was neither Aiono's supervisor nor her shift commander, and he had no authority to grant her permission to have contact with her relatives.

¶5     During her shift, Aiono spoke with Cousin.

¶6     Aiono had previously filled out a form disclosing her relationship with Husband. After speaking with Cousin, she filled out another form disclosing her relationships with P.W. and Cousin. She filled out the form three weeks after her encounter with Cousin, but before a Law Enforcement Bureau investigation of the incident was completed, and about a month before UDC gave her notice of its intent to terminate her employment.

¶7     The notice informed Aiono that her actions violated Department of Human Resource Management Rule 477-9-1 and

UDC Policy AE 02/14.00, Prohibited Association/Conduct. Following a hearing in July 2015, UDC fired Aiono for her actions during the overtime shift in May. UDC "concluded that [Aiono] had failed to fill out the mandatory Relationship Disclosure Form and failed to follow the chain of command." It "further concluded that [Aiono] failed to take action and accountability when she became aware of the conflict of interest."

¶8     Aiono appealed her dismissal, and the CSRO conducted an evidentiary hearing. It issued an order upholding UDC's decision. Among other things, it found:

> It is a conflict of interest for an employee to work where a family member is housed. It is a common theme stressed by [UDC] in training and throughout an employee's career that it is inappropriate for employees to have contact with family members who are inmates. It is the employee's responsibility to take action to avoid a conflict when the employee becomes aware of the conflict.
>
> . . . .
>
> The Relationship Disclosure Form should have been filled out even if the family member was at [another] facility. Once [Aiono] was aware of the conflict, [Aiono] should have immediately notified her supervisor or the shift commander of the conflict. If neither was available, [Aiono] could have notified [Adult Probation and Parole] which has an on-duty supervisor available for questions 24 hours per day, 7 days per week.
>
> . . . .

> . . . The policy does not state when the form
> must be filled out or updated, however the form
> should be filled out immediately after an employee
> becomes aware of a conflict.

The CSRO concluded that UDC "submitted substantial evidence to support its charges that [Aiono] violated the Prohibited Association/Conduct policy."

¶9    Aiono now seeks judicial review.

ISSUE AND STANDARD OF REVIEW

¶10    Aiono's main contention[2] is that the CSRO incorrectly interpreted UDC's policy; she argues the policy's plain language does not prohibit the conduct for which she was terminated.

¶11    The parties disagree on whether we should give deference to the CSRO's decision. UDC argues this analysis is a fact-like question entitled to deference because of the "complexity of Aiono's factual scenario" and "the likelihood that future cases involving this . . . policy will also have complex and unique facts." *See Sawyer v. Department of Workforce Services*, 2015 UT 33, ¶¶ 11–12, 345 P.3d 1253 (determining that whether a mixed question should be deemed law-like or fact-like depends on several factors, including the "degree of variety and complexity in the facts to which the legal rule is to be applied," the "degree to which a trial court's application of the legal rule relies on facts observed by the trial judge," and "other policy reasons" (citation and internal quotation marks omitted)). Aiono argues this issue involves the interpretation of UDC's policy, which is a law-like

---

2. Aiono also contends substantial evidence does not support the CSRO's actions, but because we agree that the CSRO wrongly interpreted the policy and set aside its order on this basis, we need not address Aiono's other claim.

question that should be reviewed for correctness. We agree with Aiono.

¶12    While the CSRO did consider extensive evidence, including UDC's expectation of how employees were supposed to handle conflicts of interest, the training given to employees, and "basic corrections ideology and expectation that officers avoid conflict[s] of interest[] with family members," Aiono was ultimately terminated for violating UDC's written policy, not for violating UDC's expectations, training, or ideology. Neither party disputes the facts surrounding Aiono's conduct; rather, we are asked to review whether that conduct was prohibited by the plain language of the policy. This is a law-like question because the CSRO is not "in a better position than [we are] to give effect to the regulatory objective to be achieved." *Utah Dep't of Corr. v. Despain*, 824 P.2d 439, 443 (Utah Ct. App. 1991) (alteration in original) (citation and internal quotation marks omitted); *see also Ellis-Hall Consultants v. Public Service Comm'n*, 2016 UT 34, ¶¶ 31–32, 379 P.3d 1270 (determining that orders issued by the agency are "binding on interested parties" and such parties "have a right to read and rely on the terms of these regulations," and thus, the appellate court is "in as good a position as the agency to interpret the text of a regulation that carries the force of law"). Accordingly, we review the CSRO's interpretation of the policy for correctness. *See State Dep't of Public Safety v. Utah Career Service Review Board*, 2004 UT App 171, ¶¶ 2–3, 92 P.3d 776 (reviewing the board's decision interpreting an agency's policy for correctness).

ANALYSIS

¶13    The CSRO concluded Aiono was terminated for violating UDC's Prohibited Association/Conduct policy AE 02/14.00. The CSRO quoted from the policy and concluded Aiono violated the policy (1) by having contact with Cousin, which was a conflict of interest, and (2) by not immediately filling out the Relationship Disclosure Form once she became aware of the conflict. Aiono

argues the policy does not prohibit either of these behaviors. We address each alleged violation in turn.

## I. The Policy Does Not Prohibit Contact with Immediate Family Members.

¶14    "Our primary source of guidance" in interpreting the policy "is the plain and ordinary meaning of the [policy's] language." *See State v. Mooney*, 2004 UT 49, ¶ 11, 98 P.3d 420. In its decision, the CSRO quoted section one of the Prohibited Association/Conduct policy:

> It is the policy of the department that staff members shall refrain from social or business interactions with members of inmate's/offender's immediate family, and avoid off-duty interaction with offenders or frequenting locations where criminal activity occurs when such would tend to impair the reputation of the staff member or the department.

The CSRO also quoted the rationale contained in the policy, which states, "If staff members associate with criminal offenders . . . there is an increased risk that it, (1) may compromise the staff member or the legitimate interests of the department; and (2) may adversely affect public confidence and trust in the department and its staff." Finally, though not referenced in the CSRO's decision, section four of the policy provides, "Employees shall not establish, maintain or promote a personal relationship with offenders who are not part of the employees' immediate family in any manner that would compromise an employee's professional role or which would tend to discredit the department."

¶15    The plain language of these provisions does not prohibit contact with offenders who are a part of the employee's immediate family. First, the initial section prohibits "social or

business interactions with members of inmate's/offender's immediate family." This precludes an employee from interacting with members of an *offender's* immediate family; it does not prohibit an employee from interacting with offenders who are part of the *employee's* immediate family. Additionally, the clause prohibiting off-duty interaction with offenders does not apply to Aiono, because her contact with Cousin occurred while she was on duty.

¶16 Next, section four prohibits employees from establishing, maintaining, or promoting personal relationships with offenders, but specifically exempts offenders who are part of the employee's immediate family. The CSRO's decision did not include this provision, but it did conclude that "[i]mmediate family members include cousins."[3] This section implies employees are allowed to maintain personal relationships with offenders who are immediate family members, and thus there is no implication under this provision that contact with offenders who are family members is prohibited.

¶17 Most importantly, section six, entitled "Procedure: Prohibited Association Exceptions," states, "Nothing in this section is intended to prevent employees from . . . interacting with their own family members who are offenders or ex-offenders . . . ." Rather than prohibiting contact with family members who are offenders, this provision explicitly allows it. Though the rationale of the policy outlines why contact with offenders is be avoided, the policy exempts employees' own family members.

---

3. The CSRO's conclusion that cousins are immediate family members may be contrary to the common understanding of the term. *See Family, Immediate Family*, Black's Law Dictionary (9th ed. 2009) (defining "immediate family" as a "person's parents, spouse, children, and siblings," including "[s]tepchildren and adopted children"). The CSRO did not provide reasoning for this conclusion, and neither party challenges it.

¶18 The CSRO's decision quoted from the policy but did not analyze how Aiono had violated it. Nor did the decision expressly state that the policy prohibited contact with offenders who are family members. Instead of demonstrating how the policy prohibited Aiono's conduct, the CSRO stated that there "was substantial evidence presented that contact with a family member is a conflict of interest," which was "a common theme stressed by [UDC] in training and throughout an employee's career."

¶19 There is no question that an employee may be terminated for violating the policy. Because the policy is "binding on interested parties," "such parties have a right to read and rely on the terms" of the policy. *See Ellis-Hall Consultants v. Public Service Comm'n*, 2016 UT 34, ¶ 31, 379 P.3d 1270. Therefore, the CSRO "has no right to *revise* [the policy] by a later 'interpretation.'" *See id.* As discussed above, the plain language of the policy does not prohibit contact with immediate family members. Though the CSRO may have been correct that Aiono's contact with Cousin was a conflict of interest of which she should have been aware, it incorrectly incorporated these standards into the policy. Therefore, the CSRO erroneously concluded UDC met its burden in proving Aiono violated the policy by her conduct, and its decision that Aiono violated UDC's Prohibited Association/Conduct policy is incorrect.

## II. The Policy Does Not Require an Employee to Immediately Submit the Disclosure Form.

¶20 Section four of the policy requires employees to "report relationships with known offenders . . . through the chain of command, using the attached Relationship Disclosure form." Aiono submitted the disclosure form in June 2015, three weeks after her contact with Cousin in May 2015. The CSRO's decision stated, "Although the policy itself does not state when the form must be filled out or updated, the form should have been filled out immediately after the employee became aware of the conflict."

¶21    The decision did not elaborate on how the CSRO came to the conclusion that the form should have been filled out immediately. One UDC employee testified that if a person is aware of a conflict of interest beforehand, then the disclosure form should be filled out. The CSRO's decision also indicated that Aiono received training on the completion of the disclosure form, but then cursorily concluded, "The policy does not state when the form must be filled out or updated, however the form should be filled out immediately after an employee becomes aware of a conflict."

¶22    We acknowledge that Aiono may have been trained on when to submit the form and that it may have been best practice to fill out the form upon becoming aware of a conflict. But the CSRO has no authority to revise the policy by incorporating the requirement of immediate disclosure. *See Ellis-Hall*, 2016 UT 34, ¶ 31. Aiono was terminated for violating the policy, not for violating training or best practices. The policy does not state when the form must be filled out, as the CSRO recognized in its decision. The policy only requires employees to "report relationships with known offenders . . . using the attached Relationship Disclosure form," and the CSRO determined that Aiono had filled out the form. Additionally, Aiono has "a right to read and rely on the terms" of the policy. *See id.* Therefore, the CSRO incorrectly concluded that Aiono violated the policy.

¶23    Because the plain language of the policy does not prohibit the conduct for which Aiono was terminated from her employment, and because the CSRO may not interpret the policy to incorporate additional requirements, its decision to terminate Aiono was incorrect.

CONCLUSION

¶24    We set aside the decision of the CSRO. First, the plain language of the policy does not prohibit an employee from contacting an immediate family member who is an offender.

Second, the policy does not specify any timeframe for submitting the disclosure form. Thus, the policy does not prohibit Aiono's conduct and the CSRO incorrectly interpreted it in terminating Aiono's employment.

———————