*This opinion is subject to revision before final publication in the Pacific Reporter*

**2019 UT 43**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

MONTICELLO WIND FARM, LLC,
*Petitioner*,

*v.*

PUBLIC SERVICE COMMISSION OF UTAH,
*Respondent*.

No. 20180572
Filed August 12, 2019

On Petition for Review of Agency Decision

Attorneys:

Mary Anne Q. Wood, Stephen Q. Wood, Salt Lake City,
for petitioner

Michael J. Hammer, Salt Lake City, for respondent
Public Service Commission

Sean D. Reyes, Att'y Gen., Justin Jetter, Asst. Att'y Gen.,
Salt Lake City, for respondent Division of Public Utilities

Sean D. Reyes, Att'y Gen., Robert J. Moore, Asst. Att'y Gen.,
Salt Lake City, for respondent Office of Consumer Services

R. Jeff Richards, Yvonne R. Hogle, D. Matthew Moscon,
R. Chad Pugh, Salt Lake City, for respondent PacifiCorp d/b/a
Rocky Mountain Power

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PETERSEN joined.

JUSTICE PEARCE, opinion of the Court:

### INTRODUCTION

¶1   PacifiCorp entered into an agreement with Monticello Wind Farm, LLC (MWF) for the purchase of wind energy. Under Utah and federal law, PacifiCorp and MWF could set the terms for that agreement in one of two ways. They could follow the procedure set

by the Public Service Commission (Commission) and fix pricing based on PacifiCorp's avoided costs; that is, what it would cost PacifiCorp to produce the energy itself or obtain it from another source. In this event, the Commission, pursuant to its procedure, would review any executed agreement to ensure it did not exceed those costs. Or PacifiCorp and MWF could operate outside the Commission's framework. They could negotiate their own pricing terms and contractually limit the scope of the Commission's review. This case requires us to decide which type of contract MWF and PacifiCorp signed.

¶2    PacifiCorp submitted the agreement to the Commission for approval. The Commission reviewed the pricing to ensure consistency with PacifiCorp's avoided costs. The pricing, however, was based on a methodology the Commission had discontinued. And the information underlying that methodology had not been updated for several years. For those reasons, the Commission concluded the pricing could not be deemed consistent with PacifiCorp's avoided costs. The Commission denied the application.

¶3    On appeal, MWF asks us to review the Commission's order. MWF primarily asserts the parties opted out of the Commission's framework and, as a result, the Commission was obligated to approve the agreement unless its terms would seriously harm the public interest. This case turns on a question of contract interpretation and asks what type of contract the parties penned. We conclude the agreement was one negotiated within the Commission's framework. And was therefore an agreement the Commission could reject if it obligated PacifiCorp to purchase energy at a price higher than its avoided costs. The remainder of MWF's challenges are not properly before us and therefore do not provide MWF a path to victory. We affirm.

## BACKGROUND

¶4    This is not the first time we have seen these parties or been asked to weigh in on a conflict between the two. PacifiCorp[1] and MWF share a contentious history, more fully outlined in an opinion

---

[1] PacifiCorp does business in Utah as Rocky Mountain Power. PacifiCorp engaged in some conduct relevant to this opinion as PacifiCorp and in other conduct relevant to this opinion as Rocky Mountain Power. For purposes of this opinion, we do not differentiate between the two.

addressing a prior chapter in this litigation.[2] *See Ellis-Hall Consultants v. Pub. Serv. Comm'n*, 2016 UT 34, ¶¶ 1–16, 379 P.3d 1270 (*Ellis-Hall II*). We relate only the facts relevant to this stage of the proceedings.

*Regulatory Background*

¶5    "To encourage the development of alternative energy resources, federal law requires a utility to purchase wind energy and other forms of alternative power from qualifying facilities at its avoided cost—what it would have cost the utility to generate the power itself or purchase it from another source."[3] *Ellis-Hall II*, 2016 UT 34, ¶ 3 (footnote omitted) (citing 16 U.S.C. § 824a–3; 18 C.F.R. § 292.101). The Federal Energy Regulatory Commission prescribes rules governing these transactions, including rules ensuring that the rates for such purchases "shall be just and reasonable to the electric consumers of the electric utility and in the public interest."[4] 16 U.S.C.

---

[2] In the earlier litigation, Ellis-Hall Consultants was the entity embroiled in a dispute with PacifiCorp. *See Ellis-Hall Consultants v. Pub. Serv. Comm'n*, 2016 UT 34, ¶¶ 1–2, 379 P.3d 1270. Based on the record before us, it is our understanding that Ellis-Hall Consultants is the parent, owner, and developer of MWF. For purposes of this opinion, we do not distinguish between the two.

[3] Under our state code, a "qualifying power production facility" is a facility that "produces electrical energy solely by the use . . . of biomass, waste, a renewable resource, a geothermal resource, or any combination of the preceding sources;" "has a power production capacity that . . . is no greater than 80 megawatts;" and "is a qualifying small power production facility under federal law." UTAH CODE § 54-2-1(25). Whether MWF is a qualifying facility is not at issue in this proceeding.

[4] "Under the Federal Power Act, 16 U.S.C. § 791a et seq., the Federal Energy Regulatory Commission ('FERC') is responsible for regulating 'public utilities' that offer electric power in interstate commerce." *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 132 (3d Cir. 1998) (emphasis omitted). And "in 1978, Congress modified the Federal Power Act by enacting the Public Utility Regulatory Policies Act ('PURPA'), 16 U.S.C. § 823a et seq.," to "control power generation costs and ensure long-term economic growth by reducing the nation's reliance on oil and gas and increasing the use of more abundant, domestically produced fuels." *Id.* (emphasis omitted) (citation omitted). Under PURPA, FERC prescribes rules "to encourage cogeneration and small power

(continued . . .)

§ 824a–3(a), (b)(1). And state regulatory agencies are required to implement those rules. *Id.* § 824a–3(f)(1).

¶6    The Utah Code contains similar provisions.[5] Utilities are required to "offer to purchase power from qualifying power producers." UTAH CODE § 54-12-2(1). And pursuant to section 54-12-2, the terms for agreements between utilities and qualifying facilities are set in one of two ways. Under subsection (2), the Commission creates the process for determining the agreement's terms and conditions, including the power purchase rates: "The commission shall establish reasonable rates, terms, and conditions for the purchase or sale of electricity or electrical generating capacity, or both, between a purchasing utility and a qualifying power producer." *Id.* § 54-12-2(2).

¶7    "In establishing these rates, terms, and conditions, the commission shall either establish a procedure under which qualifying power producers offer competitive bids . . . or devise an alternative method which considers the purchasing utility's avoided costs." *Id.* And Utah law defines "avoided costs" in the same manner as federal law—the cost to the utility of generating the power itself or purchasing it from another electrical corporation. *See id.* § 54-2-1(1). Thus, under subsection (2), a utility fulfills its must-purchase obligation by agreeing to purchase power from a qualifying facility in accordance with the terms, conditions, and methodology the Commission sets.

¶8    Under subsection (3), in contrast, the Utah Code provides for contracts formed outside of the Commission's framework. *See id.* § 54-12-2(3). Rather than agreeing to the purchase or sale of power pursuant to the Commission's process and conditions, a utility and

---

production," which "require electric utilities to offer to" "purchase electric energy" from "qualifying cogeneration facilities and qualifying small power production facilities." 16 U.S.C. § 824a-3(a)(2).

[5] Utah Code section 54-12-1 codifies the legislature's intent to, e.g., "promote the more rapid development of new sources of electrical energy," "remove unnecessary barriers to energy transactions involving independent energy producers and electrical corporations," "encourage the development of independent and qualifying power production and cogeneration facilities," and "promote a diverse array of economical and permanently sustainable energy resources in an environmentally acceptable manner."

qualifying facility may reach an agreement on their own terms. *See id.* And they may set the pricing: "Purchasing utilities and qualifying power producers may agree to rates, terms, or conditions for the sale of electricity or electrical capacity which differ from the rates, terms, and conditions adopted by the commission under Subsection (2)." *Id.*

¶9 Subsection (3) thus mirrors a federal regulatory provision addressing "the regulation of sales and purchases between qualifying facilities and electric utilities." *See* 18 C.F.R. § 292.301(a). The federal regulation provides that "[n]othing in this subpart . . . [l]imits the authority of any electric utility or any qualifying facility to agree to a rate for any purchase, or terms or conditions relating to any purchase, which differ from the rate or terms or conditions which would otherwise be required by this subpart." *Id.* § 292.301(b)(1).

¶10 Section 54-12-2 does not further define the Commission's role with respect to these agreements. It merely provides that "[t]he commission may adopt further rules which encourage the development of small power production and cogeneration facilities." UTAH CODE § 54-12-2(4). But other provisions of state law vest the Commission with "power and jurisdiction to supervise and regulate every public utility in this state," "to supervise all of the business of every such public utility in this state, and to do all things, whether herein specifically designated or in addition thereto, which are necessary or convenient in the exercise of such power and jurisdiction." *Id.* § 54-4-1. And state law requires that "[e]very public utility shall . . . provide . . . service . . . as will be in all respects adequate, efficient, just and reasonable," and that "[a]ll rules and regulations made by a public utility affecting or pertaining to its charges or service to the public shall be just and reasonable." *Id.* § 54-3-1.

¶11 Under this framework, the Commission thus administers the state and federal laws requiring utilities to purchase power from qualifying facilities. *Ellis-Hall Consultants, LLC v. Pub. Serv. Comm'n*, 2014 UT 52, ¶ 21, 342 P.3d 256 (*Ellis-Hall I*). Accordingly, "[t]he Commission establishes the methodology for determining avoided cost. It also promulgates regulatory tariffs establishing the rules for the negotiation and approval of power purchase agreements." *Ellis-Hall II*, 2016 UT 34, ¶ 3. And, as noted above, the Commission operates under "a statutory mandate to set a rate that is in the public interest." *Ellis-Hall I*, 2014 UT 52, ¶ 21 (citation omitted).

¶12 In our earlier opinion, we addressed the regulatory process the Commission used in its administration of must-purchase

agreements. *Ellis-Hall II*, 2016 UT 34, ¶¶ 1–16, 34–42. We examined the Commission's regulatory tariff Electric Service Schedule No. 38 (Schedule 38), which governs negotiations between a qualifying facility and PacifiCorp. *Id.* ¶ 4. And as we noted there, under Schedule 38, a party seeking to enter into a power purchase agreement with PacifiCorp must first request and obtain "indicative pricing," which "is aimed at allowing the producer to make determinations regarding project planning, financing, and feasibility." *Id.* ¶¶ 1, 5 (citation omitted) (internal quotation marks omitted). PacifiCorp is required to provide indicative pricing to a qualifying facility "once the facility submits certain information regarding a proposed project." *Id.* ¶ 5. After a party receives the indicative pricing, that party should take "specific subsequent steps [identified by the Commission] . . . to be entitled to receive a draft power purchase agreement and to proceed toward final negotiation." *Id.* ¶ 6.

*Prior Litigation*

¶13  Sometime in 2012 or early 2013, MWF requested indicative pricing from PacifiCorp. *Id.* ¶¶ 2, 9. At that time, the Commission authorized "a 'market proxy' methodology for determining the avoided cost for wind power projects." *Id.* ¶ 8. And in early 2013, MWF received indicative pricing based on that methodology. *Id.* ¶ 12.

¶14 But before MWF executed a power purchase agreement with PacifiCorp, the Commission changed its approach. *Id.* The Commission issued an order discontinuing use of the market proxy method in favor of a new method, "which allowed [PacifiCorp] to determine its avoided cost based on current energy production cost rather than the cost of the most recently executed proposal" for the supply of wind energy. *Id.* ¶¶ 8, 12. "This new methodology was expected to lower [PacifiCorp's] avoided costs." *Id.* ¶ 12.[6] PacifiCorp then rescinded its indicative pricing proposal with MWF "on the ground that the [Commission] had since issued an order adopting a new pricing methodology." *Id.* ¶ 2.

¶15  MWF challenged PacifiCorp's decision. *Id.* The Commission denied the challenge. *Id.* We reversed. *Id.* In *Ellis-Hall II*, we reviewed

---

[6] As we noted in *Ellis-Hall II*, "This seems to be undisputed. . . . [MWF] asserts" it would not be "economically feasible for [MWF] to proceed under the new methodology." 2016 UT 34, ¶ 12 n.2.

Schedule 38's provisions setting out the process by which a qualifying facility may obtain indicative pricing from PacifiCorp. *Id.* ¶¶ 4–7. We also examined two orders the Commission issued that are relevant to that process, including the "Phase Two" order providing that the market proxy method would be discontinued. *Id.* ¶¶ 11–12, 34–42. And we concluded that MWF was "not required to submit a request for new indicative pricing." *Id.* ¶ 43. MWF was "entitled to proceed in reliance on the methodology set forth in the indicative pricing proposal it received from [PacifiCorp]." *Id.* In so holding, we opined that those documents "yield a right to a wind power developer to rely on the methodology set forth in the 'indicative pricing proposal'" it had received from PacifiCorp. *Id.* ¶ 37.

¶16 We explicitly and pointedly did not reach other conclusions about the process. We expressly left open whether MWF would have "a right to require [PacifiCorp] to enter into a power purchase agreement" and whether the Commission would be "require[d] . . . to approve such an agreement." *Id.* ¶ 44. "Those questions [were] not properly presented for our review," and we "decline[d] to reach them." *Id.* We likewise concluded that the scope of PacifiCorp's discretion, if any, not to enter into such an agreement was "not properly presented" for resolution. *Id.* ¶¶ 45–46.

¶17 Moreover, we expressly left unresolved the Commission's assertion that any agreement reached on "a now-outdated indicative pricing proposal [would] ultimately be thwarted by an inevitable decision by the Commission to decline to approve a power purchase agreement based on such methodology." *Id.* ¶ 47. "The Commission ha[d] not as yet declined to approve a power purchase agreement," and we declined "to offer an advisory opinion on a matter that [was] not yet ripe for our review." *Id.*

¶18 Accordingly, we reiterated that "we [were] in no position to decide whether [MWF] ha[d] an ultimate right to enter into a power purchase agreement with [PacifiCorp] or to secure approval from the Commission." *Id.* ¶ 48. We concluded only that, "for now," MWF was "entitled . . . to rely on the indicative pricing proposal it was provided" and "ha[d] no obligation to submit a request for new indicative pricing as it move[d] forward in negotiations over a power purchase agreement with [PacifiCorp]." *Id.*

*Revisions to Schedule 38*

¶19 Nearly a year before we issued our opinion in *Ellis-Hall II*, and while that case was pending before this court, the Commission revised Schedule 38 (Revised Schedule 38). *See Rocky Mountain Power*

*Electric Service Schedule No. 38* (2015).[7] Before the revision, Schedule 38 did not include a specified timeframe for the expiration of indicative pricing proposals. *See Rocky Mountain Power Electric Service Schedule No. 38* (2012).[8]

¶20  In addition, Schedule 38 stated that "such prices are merely indicative and are not final and binding." *Id.* I.B.3. Schedule 38 further provided: "Prices and other terms and conditions are only final and binding to the extent contained in a power purchase agreement executed by both parties and approved by the Commission." *Id.*

¶21 Following the changes, however, Revised Schedule 38 included a set six-month timeframe for the parties to execute a power purchase agreement using a particular pricing proposal. "The prices in the proposed power purchase agreement . . . shall be recalculated . . . using the most recent available pricing inputs and methods approved by the Commission" if a power purchase agreement has not been executed "within six (6) months after indicative pricing was provided." *Rocky Mountain Power Electric Service Schedule No. 38* I.B.9 (2015).

¶22 Revised Schedule 38 retained language indicating that pricing is not final and binding until "contained in a power purchase agreement executed by both parties and approved by the Commission." *Id.* I.B.4. And it expressly authorized the Commission to "at any time make changes to this Schedule, [qualifying facility] pricing methods and inputs, or terms and conditions applicable to [qualifying facility] pricing and power purchase agreements." *Id.*

---

[7] *See* UTAH PUB. SERV. COMM'N, DOCKET NO. 15-035-T10 (*In the Matter of Rocky Mountain Power's Filing to Comply with the Commission's Order Issued on June 9, 2015, in Docket No. 14-035-140*); UTAH PUB. SERV. COMM'N, DOCKET NO. 14-035-140 (*In the Matter of the Review of Electric Service Schedule No. 38, Qualifying Facilities Procedures, and Other Related Procedural Issues*).

[8] *See* UTAH PUB. SERV. COMM'N, DOCKET NO. 12-035-T14 (*In the Matter of Tariff Revisions in Compliance with the Commission's Report and Order in Rocky Mountain Power's 2012 General Rate Case, Docket 11-035-200 dated September 19, 2012 . . . .*); UTAH PUB. SERV. COMM'N, DOCKET NO. 11-035-200 (*In the Matter of the Application of Rocky Mountain Power for Authority to Increase Its Retail Electric Utility Service Rates in Utah and for Approval of Its Proposed Electric Service Schedules and Electric Service Regulations*).

*Current Dispute*

¶23 We issued our opinion in *Ellis-Hall II* in July of 2016. More than a year later, in late 2017, MWF and PacifiCorp entered into a power purchase agreement (PPA). In that agreement, MWF expressed its intent to operate as a qualifying facility. And PacifiCorp agreed to purchase the wind energy MWF generated as well as any associated green tags.[9]

¶24 The PPA provided that "[t]he rates, terms[,] and conditions in [the PPA] [were] in accordance with the rates, terms, and conditions approved by the Commission in Docket No. 03-035-14 for purchases from Qualifying Facilities." That docket includes several orders issued by the Commission between 2003 and 2013, including the Commission's 2005 order "resolv[ing] differences . . . regarding methods by which . . . indicative prices are determined for the purpose of negotiating agreements pursuant to Schedule No. 38." *See* UTAH PUB. SERV. COMM'N, DOCKET NO. 03-035-14 (*In the Matter of the Application of PacifiCorp for Approval of an IRP-based Avoided Cost Methodology for QF Projects Larger than One Megawatt*), Oct. 31 2005 Report and Order, at 7. In that order, the Commission approved the "market price proxy [method] for determination of avoided costs" for certain wind facilities "up to [PacifiCorp's] . . . target megawatt level of wind resources." *Id.* at 33.

---

[9] Generally speaking, a green tag or "renewable energy certificate, or REC . . . , is a market-based instrument that represents the property rights to the environmental, social and other non-power attributes of renewable electricity generation. RECs are issued when one megawatt-hour (MWh) of electricity is generated and delivered to the electricity grid from a renewable energy resource." *Green Power Partnership*, EPA, https://www.epa.gov/greenpower/renewable-energy-certificates-recs (last visited August 5, 2019). Along those lines, the PPA defined "green tags" as "(a) the Environmental Attributes associated with all Output, together with (b) the Green Tag Reporting Rights associated with such energy and Environmental Attributes, however commercially transferred or traded under any or other product names, such as 'Renewable Energy Credits,' 'Green-e Certified,' 'Carbon Credits[,]'[] or otherwise. One Green Tag represents the Environmental Attributes made available by the generation of one MWh of energy from [MWF]."

¶25 The PPA also expressly provided that it would not become effective until the Commission approved it: "This Agreement shall become effective when it is executed and delivered by both Parties and has been approved by the Commission . . . ."

¶26 And in a provision addressing the rights of the parties if PacifiCorp were to default, the PPA provided that MWF could "seek a new power purchase agreement with PacifiCorp . . . , though PacifiCorp shall not be obligated to provide in such power purchase agreement avoided cost prices that are higher than the avoided cost prices contained in this Agreement."

¶27 In addition, the PPA included a *Mobile-Sierra* clause, providing that the power purchase rates would "remain in effect . . . absent agreement of the parties" and that "the standard of review for changes hereto . . . shall be the 'public interest' application of the 'just and reasonable' standard . . . set forth" in federal case law:[10]

> Rates Not Subject to Review. The rates for service specified herein shall remain in effect until expiration of the Term, and shall not be subject to change for any reason, including regulatory review, absent agreement of the parties. Neither Party shall petition FERC pursuant to the provisions of Sections 205 or 206 of the Federal Power Act (16 U.S.C. § 792 et seq.) to amend such prices or terms, or support a petition by any other person seeking to amend such prices or terms, absent the agreement in writing of the other Party. Further, absent the agreement in writing by both Parties, the standard of review for changes hereto proposed by a Party, a non-party or the FERC acting sua sponte shall be the "public interest" application of the "just and reasonable" standard of review set forth in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332 (1956) and Federal Power Commission v. Sierra Pacific

---

[10] As the United States Supreme Court has explained, "Under th[e] Court's *Mobile–Sierra* doctrine, FERC must presume that a rate set by a freely negotiated wholesale-energy contract meets the statutory just and reasonable requirement" applicable to such contracts. *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 167 (2010) (citation omitted) (internal quotation marks omitted). "The presumption may be overcome only if FERC concludes that the contract seriously harms the public interest." *Id.* (citation omitted).

Power Co., 350 U.S. 348 (1956) and clarified by <u>Morgan Stanley Capital Group. Inc. v. Public Util. Dist. No. 1 of Snohomish</u>, 554 U.S. 527, 128 S. Ct. 2733 (2008).

¶28 Finally, the PPA included a provision indicating that it constituted the "entire agreement" between the parties: "Entire Agreement[:] This Agreement supersedes all prior agreements, proposals, representations, negotiations, discussions or letters, whether oral or in writing, regarding the subject matter hereof. No modification hereof shall be effective unless it is in writing and executed by both Parties."

¶29 PacifiCorp submitted the PPA in an application to the Commission, requesting an order approving the PPA and finding the terms "just and reasonable and in the public interest." The application noted that "PacifiCorp is obligated to purchase power from qualifying facilities," and "[i]n accordance with" *Ellis-Hall II*, "the [PPA] uses the proxy method for pricing the energy produced" by MWF.[11]

¶30 MWF intervened in the proceeding. Two other entities also made appearances,[12] each arguing that the application should be denied. The Division of Public Utilities (DPU) moved for summary judgment asserting the PPA did not comply with Revised Schedule 38's timelines. And the Office of Consumer Services (OCS) moved for summary judgment asserting the avoided cost calculations

---

[11] To the extent PacifiCorp's application suggests that, under *Ellis-Hall II*, PacifiCorp was obligated to purchase power in accordance with indicative pricing it had provided under the Commission's market proxy methodology, we note that issue is not directly before us. And that conclusion implicates questions we did not resolve, and expressly left open, in *Ellis Hall II*. *See Ellis-Hall II*, 2016 UT 34, ¶¶ 44–48.

[12] *See* UTAH CODE § 54-4a-1(1)(a) (providing that the Division of Public Utilities may "appear as a party" and "otherwise participate in proceedings before the Public Service Commission"); *id.* § 54-10a-203(2) (providing for the Office of Consumer Services to be represented "at a hearing or other proceeding affecting the services, rates, or charges of an applicable public utility"); *id.* § 54-10a-301 (setting out the Office of Consumer Services' power and duty to advocate positions advantageous to residential and small commercial consumers).

contained in the PPA were not timely calculated as required by federal regulations. *See* 18 C.F.R. § 292.304(d) (providing that, with respect to qualifying facilities, power purchase rates "shall" be based on the purchasing utility's avoided costs "calculated at the time of delivery" or "at the time the obligation is incurred"). PacifiCorp stayed mute, taking "no legal position" on the motions and leaving MWF to defend the application on its own.

¶31 In response, MWF asserted, in relevant part, that Revised Schedule 38 could not be applied retroactively. MWF claimed that the Commission lacked authority to apply orders retroactively, both as a general principle and in this particular circumstance, because MWF had, in its own estimation, "submitted every document and complied with every provision under Original Schedule 38 before [the revised schedule] took effect." According to MWF, it had "begun the Schedule 38 process and would have executed a PPA" under the earlier version of Schedule 38 "had PacifiCorp not refused to proceed with negotiations . . . under its earlier indicative pricing."

¶32 In addition, MWF pointed to *Ellis-Hall II* and asserted it had a right to rely on the market proxy methodology for purposes of the PPA. MWF also claimed that it had incurred a legally enforceable obligation[13] with PacifiCorp, prior to execution of the PPA and prior to the Commission's Phase Two order altering the method for calculating avoided costs. On those grounds, MWF alleged, the Commission could not reject the PPA based on its reliance on the market proxy methodology.

¶33 Finally, MWF threw in a reference to subsection (3) of section 54-12-2. Citing that provision, MWF briefly asserted that

---

[13] Qualifying facilities have the option of providing energy to a purchasing utility "pursuant to a legally enforceable obligation." 18 C.F.R. § 292.304(d). FERC has explained that "[s]ection 292.304(d) and the requirement that a [qualifying facility] can sell and a utility must purchase pursuant to a legally enforceable obligation were specifically adopted to prevent utilities from circumventing the requirement of PURPA that utilities purchase energy and capacity from [qualifying facilities]." *Cedar Creek Wind, LLC*, 137 FERC ¶ 61006, ¶ 32 (Oct. 4, 2011). "Thus, . . . if the electric utility refuses to sign a contract, the [qualifying facility] may seek state regulatory authority assistance to enforce the PURPA-imposed obligation on the electric utility . . . and a non-contractual, but still legally enforceable, obligation will be created . . . ." *Id.*

PacifiCorp and MWF were "not limited" to the rates, terms, and conditions the Commission set, but had "negotiated" their own terms, and "nothing in the PPA require[d] the [Commission] to first find that the rates, terms, and conditions [were] consistent with any order of the [Commission] before approving the PPA."

¶34 The Commission granted both motions for summary judgment. The Commission noted that, for purposes of the parties' agreement, the "prices [PacifiCorp] agree[d] to pay in the PPA are the same as those it provided in [its] 2013 Indicative Pricing [Proposal]." And the Commission concluded that, "on its face," the application "fails to comply with Schedule 38 and uses outdated avoided cost pricing that is not reflective of [PacifiCorp's] Must Purchase Obligation under applicable law."

¶35 To reach that conclusion, the Commission first noted that PacifiCorp sought an order approving the PPA. The Commission observed that "[t]he requested relief [was] consistent with Schedule 38[,] which articulates a requirement for [Commission] approval prior to the agreements becoming effective." The Commission then opined on its role with respect to approval of the PPA. Citing much of the regulatory background noted above, the Commission characterized its "primary role" in evaluating the application as determining "whether the rates are in the 'public interest' and, more specifically, do not exceed avoided costs."

¶36 The Commission then turned to the calculation of avoided costs the PPA used. Applying Revised Schedule 38, the Commission noted that "avoided cost pricing for [qualifying facilities'] PPAs in Utah is ordinarily calculated at the time the [qualifying facility] receives indicative pricing, provided the [qualifying facility] enters [into] a PPA within six months." Because MWF did not enter into a power purchase agreement within that timeframe, but sought approval of an agreement executed in 2017, which incorporated pricing methodology discontinued in 2013, the application "foreclose[d]" the Commission from "finding the PPA's pricing accurately reflects avoided costs under Schedule 38."

¶37 And with respect to MWF's reliance on *Ellis-Hall II* as a basis for those pricing terms, the Commission highlighted the questions we expressly left open in that opinion, and concluded that *Ellis-Hall II* did "not necessarily . . . require[]" PacifiCorp to enter into the PPA or require that the Commission approve such an agreement. The Commission suggested that a contrary interpretation of *Ellis-Hall II* would conflict with federal law.

¶38  With regard to "whether [Revised] Schedule 38's six-month time period for execution is applicable to the PPA," the Commission concluded that it "plainly [was]." "There is nothing retroactive about applying tariff provisions that have been effective since August 2015 to a PPA executed in December 2017."

¶39  But, notably, the Commission also concluded that "it ma[de] no difference" which version of Schedule 38 applied. "[N]othing in Former Schedule 38 vested a [qualifying facility], who had obtained indicative pricing, to compel [PacifiCorp] to enter a contract years later based on stale pricing." The terms of "Former Schedule 38 expressly provided [that PacifiCorp] 'will update its pricing proposals at appropriate intervals to accommodate any changes to [its] avoided-cost calculations.'" (Second alteration in original.) And the Commission's "role in applying Schedule 38 (in any of its iterations) and approving PPAs is to ensure . . . [PacifiCorp] pays no more than its avoided cost." Accordingly, the Commission concluded, "[w]hether we apply Former Schedule 38 or current Schedule 38, we cannot find that [the PPA's] pricing reflects the avoided cost rates [PacifiCorp] must pay to satisfy its Must Purchase Obligation."

¶40 The Commission did not reach any conclusion "as to whether MWF may demonstrate a [legally existing obligation] prior to the execution of its PPA in December 2017" and left open the opportunity for MWF to do so.[14] In addition, the Commission did not expressly address MWF's fleeting assertion that under subsection (3) of section 54-12-2, the Commission could approve the PPA even if it did not comply with the Commission's pricing methodology.

¶41 MWF petitioned the Commission for reconsideration and rehearing. MWF asserted that by June of 2013, it had established a

---

[14] The Commission opened a separate docket "for the purpose of adjudicating [MWF's] assertion that a legally enforceable obligation ('LEO') existed as of June 25, 2013." But MWF asked the Commission to terminate that docket, explaining that it planned to seek judicial review of the Commission order at issue here. In response to MWF's request, the Commission stayed the docket, stating that it would not take "further action on the matter . . . until and unless a party requests otherwise." No questions regarding the existence of a legally existing obligation have been raised in this proceeding, and we do not address that issue here.

legally existing obligation with PacifiCorp for the purchase of wind energy, and MWF "elected to administer the legally enforceable obligation" through the PPA executed in 2017. On that basis, MWF asked that the Commission alter its order.

¶42 In support, MWF asserted two claims. First, MWF asked for summary approval of the application based on the existence of a legally enforceable obligation and a negotiated-rate contract. According to MWF, the Commission had erred by "rejecting a negotiated rate contract that [was] fully[ ]compliant with federal law, as the PPA . . . fairly administer[ed] the legally enforceable obligation . . . [PacifiCorp] incurred in 2013 to purchase [energy] from [MWF] at an avoided-cost rate computed on the Market Proxy methodology." MWF asserted that the PPA—permitting PacifiCorp to purchase energy from MWF, obtain the associated green tags, and avoid "substantial litigation expenses"—"represent[ed] a resolution to a complex case," and "nothing in federal law" restricted PacifiCorp's "ability to agree to pay . . . a rate in excess of an avoided cost proxy methodology." Therefore, in MWF's view, "[t]he factual record, clearly establishing a legally enforceable obligation was incurred on or before June 25, 2013, provide[d] a sufficient basis for the [Commission] to summarily approve" the application.

¶43 In the alternative, "[i]f the [Commission] decline[d] to summarily affirm the . . . contract that set[] forth the terms and conditions by which the legally enforceable obligation . . . [would] be administered, then [MWF] request[ed] that the [Commission] grant rehearing and issue findings of fact and conclusions of law" in MWF's favor. MWF requested that the Commission conclude, as a matter of law, that "[MWF] established a legally enforceable obligation on or about June 25, 2013," that "[a]s of June 25, 2013, [PacifiCorp] was obligated to calculate the avoided cost by reliance on the Market Proxy methodology," and that "[PacifiCorp] [was] obligated to purchase the output from [MWF] pursuant to the terms and conditions of [the PPA]."

¶44 In the context of this alternative argument, asserting a legally enforceable obligation requiring PacifiCorp to purchase power from MWF under the market proxy methodology, MWF briefly addressed the Commission's application of Revised Schedule 38. "[MWF] request[ed] that the [Commission] reconsider its conclusion that the Schedule 38 Tariff put into effect in June 2015 governs either the negotiated-rate contract voluntarily executed by the parties in 2017 or the legally enforceable obligation incurred by [PacifiCorp] in June 2013." MWF claimed the application of Revised Schedule 38 constituted an impermissible collateral attack on *Ellis-*

*Hall II* and was "arbitrary, capricious, inconsistent with reasoned decisionmaking and violate[d] the rule against retroactive rulemaking." MWF did not address the portion of the Commission's order concluding it was inconsequential whether it applied the revised or earlier version of Schedule 38.

¶45 The Commission denied MWF's petition. The Commission did not delve into the arguments MWF raised, but stated that "[f]or all of the reasons enumerated" in its prior order, the Commission "affirm[ed] [its] conclusion that the PPA . . . failed to comply with Schedule 38 and employed outdated avoided cost pricing . . . not reflective of [PacifiCorp's] obligation to purchase power from qualifying facilities under applicable law." MWF filed a petition for review with this court.

## STANDARD OF REVIEW

¶46 "[A]gency decisions premised on pure questions of law are subject to non-deferential review for correctness." *Ellis-Hall II*, 2016 UT 34, ¶ 27.

## ANALYSIS

¶47 MWF raises a number of challenges to the Commission's order denying PacifiCorp's application for approval of the PPA. MWF first asserts PacifiCorp and MWF "had an unambiguous right to enter into the PPA without adhering to [the Commission's] regulations regarding avoided costs." On that basis, MWF claims the Commission could reject the PPA's pricing terms only upon a showing that they would seriously harm the public interest. And according to MWF, no such showing was made. Second, MWF asserts the Commission erred in its interpretation and retroactive application of Revised Schedule 38. Finally, MWF asserts a number of constitutional violations with respect to Revised Schedule 38.

### I. MWF Fails to Demonstrate That the PPA's Pricing Terms and Avoided Cost Methodology Were Not Subject to Commission Review and Approval

¶48 The central issue on appeal asks whether the Commission exceeded the scope of its authority in reviewing and rejecting PacifiCorp's application for approval of the PPA. And that question turns on whether we view the application as containing pricing settled on as a result of the parties' negotiations, pursuant to Utah Code section 54-12-2(3), or as dictated by the Commission's regulatory framework, pursuant to Utah Code section 54-12-2(2) and Schedule 38. The Commission treated the application as falling into the latter category and rejected the application because it did not

find the PPA's pricing terms to be equal to or less than PacifiCorp's avoided costs. For that reason, the Commission did not find the PPA's pricing terms to be in the "public interest."

¶49 With respect to the kind of contract the parties' submitted and the review it warranted, the Commission explained that it reviewed the PPA under a provision of Schedule 38 providing that "[p]rices and other terms and conditions" of agreements executed between PacifiCorp and qualifying facilities "are only final and binding to the extent . . . approved by the Commission." *See Rocky Mountain Power Electric Service Schedule No. 38* I.B.4 (2015).[15]

¶50 This review was appropriate, the Commission explained, because PacifiCorp had submitted the PPA to the Commission requesting an order approving the PPA and finding its terms and conditions "just and reasonable and in the public interest." The Commission observed that this "requested relief [was] consistent with Schedule 38[,] which articulates a requirement for [Commission] approval prior to [an agreement between PacifiCorp and a qualifying facility] becoming effective." And when reviewing contracts submitted in accordance with Schedule 38, the Commission reasoned, its "primary role is to find whether the rates are in the 'public interest' and, more specifically, do not exceed avoided costs." The Commission thus reviewed the PPA under a Schedule 38 provision providing for approval of contracts negotiated within that framework.

¶51 Schedule 38 outlines the Commission-approved process for negotiating power purchase agreements between PacifiCorp and qualifying facilities. *See Rocky Mountain Power Electric Service Schedule No. 38.* Under that schedule, a qualifying facility may obtain indicative pricing from PacifiCorp and then, based on that pricing, proceed toward execution of a final agreement. *Id.* I.B. PacifiCorp calculates indicative pricing based on a Commission-approved methodology aimed at capturing PacifiCorp's avoided costs. *See id.* I.B.4. As noted above, Schedule 38 provides that indicative pricing

---

[15] In a separate argument, MWF asserts the Commission should have reviewed the PPA under an earlier version of Schedule 38. *See infra* ¶ 75. But whether the PPA is subject to Commission review pursuant to Schedule 38 does not depend on which version of the schedule we reference. And for purposes of our review here, we cite to the revised schedule.

does not become final until the parties execute an agreement and the Commission approves. *Id.*

¶52 MWF challenges the Commission's order, arguing the Commission erroneously invoked Schedule 38 as a basis for reviewing the PPA. And therefore, according to MWF, the Commission applied the wrong type of review. MWF claims that the level of review in which the Commission engaged applies only when a utility and qualifying facility enter into an agreement incorporating the rates, terms, and conditions the Commission specifies in Schedule 38. In contrast, when parties operate outside of the Commission's rules and negotiate their own terms, an agreement cannot be rejected, MWF asserts, unless its terms would seriously harm the public interest or the parties contractually grant the Commission greater review authority. According to MWF, PacifiCorp and MWF negotiated outside Schedule 38's framework and, as a result, the PPA provides for limited Commission review.

¶53 Utah Code section 54-12-2 lends the backbone of MWF's argument. Subsection (1) provides that "[p]urchasing utilities shall offer to purchase power from qualifying power producers."

¶54 Under subsection (2), the Commission controls the process:

> The commission shall establish reasonable rates, terms, and conditions for the purchase or sale of electricity or electrical generating capacity, or both, between a purchasing utility and a qualifying power producer. In establishing these rates, terms, and conditions, the commission shall either establish a procedure under which qualifying power producers offer competitive bids for the sale of power to purchasing utilities or devise an alternative method which considers the purchasing utility's avoided costs. The capacity component of avoided costs shall reflect the purchasing utility's long-term deferral or cancellation of generating units which may result from the purchase of power from qualifying power producers.

UTAH CODE § 54-12-2(2).

¶55 MWF's argument focuses on subsection (3), under which a qualifying facility and purchasing utility may negotiate their own terms. "Purchasing utilities and qualifying power producers may agree to rates, terms, or conditions for the sale of electricity or

electrical capacity which differ from the rates, terms, and conditions adopted by the commission under Subsection (2)." *Id.* § 54-12-2(3).[16] When parties negotiate pricing pursuant to subsection (3), MWF asserts, those terms may be set aside by the Commission only upon a showing that they seriously harm the public interest, unless the parties contractually agree to grant the Commission greater review authority.

¶56 MWF's initial premise is largely undisputed. The Commission agrees that PacifiCorp may, and often does, enter into power purchase agreements that are not based on the Commission's methodology for calculating avoided costs and are not subject to Commission approval for compliance.[17] And we agree with MWF that the parties could operate outside of the Commission's framework and enter into an agreement containing rates, terms, and conditions that differ from those the Commission prescribes. Heavily contested, however, is whether that is what PacifiCorp and MWF actually did.

¶57 The problem with MWF's argument is that it largely ends here. Having demonstrated that parties *may* negotiate power purchase rates outside of Schedule 38, the next step in MWF's argument would be to establish, as a matter of contract interpretation, that the parties did exactly that. But in its principal brief, MWF takes this issue almost entirely for granted. In other words, to paraphrase Dr. Ian Malcolm, MWF's brief is so preoccupied with whether or not it could enter into such an agreement, it doesn't stop to demonstrate that it did.

¶58 With respect to this central question of contract interpretation, MWF gives us the following line: "There can be no doubt that the Commission lacked the authority to enforce its tariff, Schedule 38, against the PPA, because the PPA was entered into by [PacifiCorp] and [MWF] under 18 C.F.R. § 292.301(b) and Utah Code Ann. § 54-12-2(3)." Examining MWF's brief for further development of this point, we find precious little.

---

[16] *See also* 18 C.F.R. § 292.301(b)(1) ("Nothing in this subpart . . . [l]imits the authority of any electric utility or any qualifying facility to agree to a rate for any purchase, or terms or conditions relating to any purchase, which differ from the rate or terms or conditions which would otherwise be required by this subpart . . . .").

[17] The record before us does not provide visibility into how often PacifiCorp enters into these types of contracts.

¶59 Whether PacifiCorp and MWF negotiated an agreement outside of the Commission's Schedule 38 framework is a question of contract interpretation. And when interpreting contracts, "we first look at the plain language [of the contract] to determine the parties' meaning and intent." *Brady v. Park*, 2019 UT 16, ¶ 53, --- P.3d --- (alteration in original) (citation omitted). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id.* (citation omitted). "[W]here a contractual term or provision is ambiguous as to what the parties intended, the question becomes a question of fact to be determined by the fact-finder." *Id.*

¶60 The PPA provided that "[t]he rates, terms[,] and conditions in [the PPA] [were] in accordance with the rates, terms, and conditions approved by the Commission in Docket No. 03-035-14 for purchases from Qualifying Facilities." That docket includes the Commission's 2005 order "resolv[ing] differences . . . regarding methods by which . . . indicative prices are determined for the purpose of negotiating agreements pursuant to Schedule No. 38." *See* UTAH PUB. SERV. COMM'N, DOCKET NO. 03-035-14 (*In the Matter of the Application of PacifiCorp for Approval of an IRP-based Avoided Cost Methodology for QF Projects Larger than One Megawatt*), Oct. 31, 2005 Report and Order, at 7.

¶61 And in that 2005 order, the Commission approved the "market price proxy [method] for determination of avoided costs" for certain wind facilities "up to [PacifiCorp's] . . . target megawatt level of wind resources." *Id.* at 33. The PPA thus purported to be consistent with pricing principles the Commission set as part of its process for obtaining an executed agreement under Schedule 38.

¶62 The PPA also expressly provided, consistent with Schedule 38, that it would not become effective until the Commission approved: "This Agreement shall become effective when it is executed and delivered by both Parties and has been approved by the Commission . . . ."

¶63 Moreover, in an approach again consistent with Schedule 38 and the Commission's methodology for determining pricing, the PPA expressly characterized its pricing terms as being based on avoided costs. The PPA provided that MWF could "seek a new power purchase agreement with PacifiCorp . . . , though PacifiCorp shall not be obligated to provide in such power purchase agreement avoided cost prices that are higher than the *avoided cost prices contained in this Agreement*." (Emphasis added.)

¶64 Finally, the PPA included a provision indicating that it constituted the "entire agreement" between the parties: "This Agreement supersedes all prior agreements, proposals, representations, negotiations, discussions or letters, whether oral or in writing, regarding the subject matter hereof. No modification hereof shall be effective unless it is in writing and executed by both Parties." As OCS and DPU assert, and MWF appears not to contest, this provision indicates the contract is "integrated," meaning that "parol evidence is . . . not admissible to vary or contradict the clear and unambiguous terms of the contract." *Tangren Family Tr. v. Tangren*, 2008 UT 20, ¶ 11, 182 P.3d 326 (citation omitted) (internal quotation marks omitted).

¶65 We are therefore presented with an integrated contract that expressly relies on, and purports to be consistent with, the framework set out in Schedule 38 and the Commission's methodology for determining pricing. The leap MWF's position requires us to make is that this Commission-driven methodology and pricing were selected, not because the parties intended to operate within the contours of Schedule 38, but because the parties intended to operate outside it. And we must reach that conclusion even though, consistent with Schedule 38, the PPA expressly contemplates Commission approval prior to becoming effective.

¶66 MWF does not discuss these portions of the PPA. Instead, MWF hones in on three other aspects of the PPA. And MWF uses these three provisions to argue that the PPA reflects that the parties negotiated outside of the Commission's Schedule 38 framework.

¶67 First, as MWF points out, the PPA's pricing terms do not reflect the Commission's current methodology for calculating avoided costs. Rather, to calculate the cost, the pricing terms rely on a discontinued methodology—albeit one the Commission previously endorsed (and the same one we addressed in *Ellis-Hall II*). That discrepancy, MWF asserts, takes the contract outside of Schedule 38 and demonstrates an agreed-upon intent to depart from a Commission-controlled process. In other words, because the PPA incorporates an allegedly out-of-date methodology for capturing avoided costs, MWF alleges the parties must have intended pricing not reflective of avoided costs or subject to robust Commission review.

¶68 But MWF's reading has the potential to nullify the Commission's role in approving agreements entered into under subsection (2). Particularly if, as the Commission stated in its order and no one has disputed here, the Commission's "primary role" in

reviewing such contracts is to determine that the pricing terms "do not exceed avoided costs." Under MWF's approach, if the Commission reviewed what appeared to be a subsection (2) contract, but concluded the agreement's power purchase rates were not consistent with Schedule 38 and the Commission's avoided-cost methodology, the Commission should simply conclude that the parties intended a subsection (3) contract.

¶69 Moreover, MWF's interpretation falls apart in light of the abundance of other provisions that demonstrate the parties intended to operate consistent with Schedule 38's framework. For example, MWF offers no explanation for the PPA provisions that call for Commission approval, characterize the pricing as based on avoided costs, and profess compliance with the Commission-approved methodology generated in accordance with the process Schedule 38 outlines. Perhaps an argument might be crafted that would reasonably explain why all of these terms would exist in an agreement reached by parties who have no intention of operating in a Schedule 38 world. But we do not have that argument before us, and we are not at liberty to make it for MWF.

¶70 MWF next cites the PPA's *Mobile-Sierra* clause. That provision provides that the power purchase rates would "remain in effect . . . absent agreement of the parties" and "the standard of review for changes hereto . . . shall be the 'public interest' application of the 'just and reasonable' standard . . . set forth" in federal case law. Under that standard, MWF proposes, a regulatory body—including the Commission—may review the PPA's power purchase rates only to determine if they would seriously harm the public interest.

¶71 The Commission and PacifiCorp, as well as OPC and DPU, disagree with MWF's reading of that provision, however, and provide an alternative explanation of its meaning. They assert the *Mobile-Sierra* clause becomes effective only after the Commission approves the PPA, and it applies only to any subsequent review of the agreement by federal regulatory bodies. This interpretation is supported by the provision's text, which twice mentions potential review by a federal regulatory body—not the Commission—and refers to the PPA's rates as "remain[ing] in effect," which, as noted above, may occur only after Commission approval.

¶72 When read in light of the PPA's other provisions, which tie the agreement to the Commission's methodology for determining avoided-cost pricing and require approval consistent with Schedule 38, we would be hard-pressed to read the *Mobile-Sierra* clause as

taking the PPA outside the realm of Schedule 38 and subjecting it to a remarkably different review process. Were we to read the *Mobile-Sierra* clause in the manner MWF advocates, we would still lack any attempt from MWF to harmonize that interpretation with the PPA's remaining provisions. In contrast, Respondents' interpretation of the *Mobile-Sierra* clause is consistent with its language and the PPA's other terms.

¶73 Finally, MWF asserts that because it agreed to transfer any associated green tags to PacifiCorp, that, "by itself, was enough to take the PPA outside the standard 'avoided cost' rules." We disagree. Many of the PPA's terms may have some effect on the total cost to PacifiCorp of acquiring energy from MWF. But those peripheral effects on total cost do not alter the question before us: whether the parties entered into an agreement not to be bound by Schedule 38 or Commission review of whether the power purchase rates were consistent with PacifiCorp's avoided costs. Moreover, the Commission's 2005 order issued in Docket No. 03-035-14 instructs that green tag ownership is a contractual issue between the qualifying facility and PacifiCorp. *See* Utah Pub. Serv. Comm'n, Docket No. 03-035-14 (*In the Matter of the Application of PacifiCorp for Approval of an IRP-based Avoided Cost Methodology for QF Projects Larger than One Megawatt*), Oct. 31 2005 Report and Order, at 34. In other words, negotiation of green tag ownership is as consistent with an agreement reached within the Schedule 38 framework as it would be with an agreement reached by parties negotiating their own terms.

¶74 Accordingly, we find no ambiguity about what the parties intended the PPA to be. MWF has failed to establish that the PPA's avoided-cost methodology was not subject to Commission review pursuant to Schedule 38. MWF has also failed to establish that the PPA's pricing terms could be rejected by the Commission only upon a showing that they would seriously harm the public interest.

### II. MWF Protests the Commission's Application of Revised Schedule 38, But Left Unaddressed the Alternative Basis of the Commission's Order

¶75 MWF next claims that if the PPA's pricing terms and methodology are subject to Commission review under Schedule 38, the Commission should have applied the earlier version of that schedule. In addition, according to MWF, the terms of Revised Schedule 38 did not support rejection of the PPA. As MWF puts it, "it was error to apply the 2015 Schedule 38 retroactively. And, even

if the 2015 Schedule 38 were applicable retroactively, it was error to read it to require rejection of" the PPA.

¶76 The Commission did not, however, merely reject the PPA based on its conclusion that Revised Schedule 38 applied. Under a heading in the Commission's order entitled, "The PPA is subject to Schedule 38, but the outcome would not be different were Former Schedule 38 applicable," the Commission concluded that "it makes no difference whether Schedule 38 or Former Schedule 38 applies because nothing in Former Schedule 38 vested a [qualifying facility], who had obtained indicative pricing, to compel [PacifiCorp] to enter a contract years later based on stale pricing." The Commission continued, "Our Order Revising Schedule 38 provided greater specificity to the process, but it did not . . . alter [the Commission's] role or the underlying law." "Whether we apply Former Schedule 38 or current Schedule 38, we cannot find that [the PPA's] pricing reflects the avoided costs [PacifiCorp] must pay to satisfy its Must Purchase Obligation."

¶77 To reach these conclusions, the Commission addressed the questions we expressly left open in *Ellis-Hall II*: whether MWF would have "a right to require [PacifiCorp] to enter into a power purchase agreement" based on market proxy indicative pricing and whether the Commission would be "require[d] . . . to approve such an agreement." *Ellis-Hall II*, 2016 UT 34, ¶ 44; *see also id.* ¶ 47 (reaching no conclusion as to the assertion that any agreement reached based on "a now-outdated indicative pricing proposal [would] ultimately be thwarted by an inevitable decision by the Commission to decline to approve a power purchase agreement based on such methodology"). The Commission ultimately concluded that the result would be the same under the earlier or revised version of Schedule 38—the Commission would not approve the PPA.

¶78 MWF does not, in its opening brief, acknowledge this alternative basis for the Commission's decision to reject the PPA. A party challenging an agency order "bear[s] the burden of adequately briefing all independent bases of the order from which they appeal." *Living Rivers v. Exec. Dir. of the Utah Dep't of Envt'l Quality*, 2017 UT 64, ¶ 25, 417 P.3d 57 (citing *Simmons Media Grp. v. Waykar, LLC*, 2014 UT App 145, ¶ 32, 335 P.3d 885 ("This court will not reverse a ruling of the [district] court that rests on independent alternative grounds where the appellant challenges only one of those grounds." (alteration in original) (citation omitted))). Here, however, MWF has failed to address the Commission's alternative ground for its order— that the result would have been the same under the earlier version of

Schedule 38 for which MWF advocates. Thus, even were MWF to prevail on its argument, it would not be entitled to the relief it seeks, as an alternative basis for the Commission's order would remain intact.

¶79 MWF's only response to this portion of the Commission's order appears in its reply brief: a few cursory sentences asserting that the Commission simply got it wrong. But whether MWF's conclusory argument is too little is beside the point—the argument comes too late.

¶80 "It is well settled that issues raised . . . in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." *Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903 (citation omitted) (internal quotation marks omitted). Our appellate rules provide an opportunity "to respond[] to the facts and arguments raised" in an appellee's or respondent's "principal brief." UTAH R. APP. P. 24(b). But the opportunity to "respond" is not a license to gap-fill missing arguments. When a respondent's brief points out that an issue is unpreserved or an alternative ground is unchallenged, a petitioner may not "respond" with newly crafted substantive arguments as to that issue or ground. The timely presentation of arguments is essential to providing an opposing party with a fair opportunity to respond.

¶81 That principle is fully at play here. Until its reply brief, MWF had provided no substantive argument as to the Commission's authority to reject the PPA under the earlier version of Schedule 38. No argument as to the Commission's role, under that schedule, in reviewing an agreement that incorporated years-old pricing based on methodology the Commission deemed out-of-date. Thus, other than MWF's argument that the PPA was not subject to *any* version of Schedule 38, which we addressed above, no argument regarding the earlier version of Schedule 38 appears in MWF's principal brief. Because MWF's argument on this issue appears for the first time in its reply brief, we do not consider its merits.[18]

---

[18] Still, we note that MWF's conclusory response on reply, that the Commission's approach is inconsistent with the earlier version of Schedule 38 and constitutes "nothing but a rehash of the arguments" in *Ellis-Hall II*, does little to illuminate the issue. Which version of Schedule 38 would apply to a later-executed agreement was not at issue in *Ellis-Hall II*. And broad questions pertaining to the Commission's authority to approve an agreement incorporating

(continued . . .)

### III. MWF Raises Constitutional Challenges to the Application of Revised Schedule 38, None of Which Are Properly Before Us

¶82 MWF also raises a number of constitutional challenges to Revised Schedule 38. MWF claims Revised Schedule 38 "was aimed squarely and exclusively at [MWF]" and therefore constitutes "special legislation" in violation of Utah Constitution article VI, section 26. *See* UTAH CONST. art. VI, § 26 ("No private or special law shall be enacted where a general law can be applicable."). MWF also claims Revised Schedule 38 "will sometimes," but not always, "apply retroactively," and is therefore "not uniform in its operation" in violation of Utah Constitution article I, section 24. *See id.* art. I, § 24 ("All laws of a general nature shall have uniform operation."). Finally, MWF asserts Revised Schedule 38 is unconstitutionally vague because it "typically" applies to projects already under development, leaving it within PacifiCorp's or the Commission's "unfettered discretion" whether to apply the revised schedule "retroactively."

¶83 But as OCS and DPU point out, these constitutional challenges were not presented to the Commission in MWF's petition for rehearing. They have made their first appearance in MWF's briefing on appeal. And as a result, MWF's constitutional challenges are not properly before us.

¶84 Utah Code section 54-7-15 provides that "[b]efore seeking judicial review of the commission's action, any party . . . who is dissatisfied with an order of the commission shall meet the requirements of this section." UTAH CODE § 54-7-15(1). Section 54-7-15 then provides for a process of rehearing before the Commission: "After any order or decision has been made by the commission, any party . . . may apply for rehearing of any matters determined in the action or proceeding." *Id.* § 54-7-15(2)(a). And a party's opportunity to seek judicial review is tied to its participation in the rehearing process: "An applicant may not urge or rely on any ground not set forth in the application [for rehearing] in an appeal to any court." *Id.* § 54-7-15(2)(b).

¶85 We have stated that this preservation rule applies as a matter of statutory mandate, *e.g.*, *ABCO Enters. v. Utah State Tax Comm'n*, 2009 UT 36, ¶ 10, 211 P.3d 382, and is a requisite step in "exhaust[ing] all administrative remedies" before being "allowed to

---

"outdated" pricing terms were left unresolved in that opinion. *See Ellis-Hall II*, 2016 UT 34, ¶¶ 44, 47.

seek judicial review of an agency decision," *In re Questar Gas Co.*, 2007 UT 79, ¶ 47, 175 P.3d 545. Accordingly, a party must raise a ground of error on petition for rehearing before the Commission or "it has waived its right to raise th[ose] arguments in this court." *Westside Dixon Assocs. LLC v. Utah Power & Light Co./PacifiCorp*, 2002 UT 31, ¶ 23, 44 P.3d 775.

¶86 MWF filed a petition for rehearing before the Commission, and asserted that its petition was filed pursuant to section 54-7-15. But MWF's petition did not raise any of these constitutional challenges. Accordingly, MWF has waived its right to present these arguments to this court. *See id.*

¶87 MWF nevertheless asserts we may consider these challenges under the plain error and exceptional circumstances exceptions to our general rule of issue preservation. *See Salt Lake City v. Kidd*, 2019 UT 4, ¶ 31, 435 P.3d 248 (noting that "[a]s a general rule, claims not raised before [a] trial court may not be raised on appeal" unless the complaining party "can demonstrate that exceptional circumstances exist or plain error occurred" (citations omitted) (internal quotation marks omitted)). OCS and DPU disagree, asserting that section 54-7-15 operates as a jurisdictional requisite, leaving us no room to apply those exceptions here. We do not resolve that question because it is immaterial to the outcome; MWF's briefing falls far short of persuading us that either doctrine has application to the unpreserved challenges it raises.

¶88 To demonstrate plain error, an appellant must establish that an error exists, it should have been obvious to the trial court, and the error was harmful. *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346. Demonstrating error that "should have been obvious to the trial court" does not always require recitation of case law directly on point. But it does require a showing of error that was, nonetheless, plain. And the alleged constitutional missteps MWF claims are not "plain" by a long stretch.

¶89 In addition, we apply the exceptional circumstances doctrine sparingly, "to reach an unpreserved issue where a rare procedural anomal[y] has either prevented an appellant from preserving an issue or excuses a failure to do so." *State v. Johnson*, 2017 UT 76, ¶ 29, 416 P.3d 443 (alteration in original) (citation omitted) (internal quotation marks omitted). Failure to raise an argument in a petition for rehearing does not constitute such a circumstance. Accordingly, MWF's constitutional challenges are not properly before us.

## CONCLUSION

¶90  MWF has failed to demonstrate that the PPA's avoided cost methodology was not subject to Commission review. MWF has likewise failed to demonstrate that the Commission was required to approve the PPA unless its pricing terms would seriously harm the public interest. MWF did not timely raise the remainder of its challenges. We affirm.